WELBY, BRADY & GREENBLATT, LLP
Anthony P. Carlucci, Jr., Esq. [AC7565]
Attorneys for Plaintiff
Westchester Financial Center
11 Martine Avenue, 15th Floor
White Plains, New York 10606
Telephone (914) 428-2100
Telefax (914) 428-2172
ACarlucci@wbgllp.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

INDUSTRIAL WINDOW CORP.,                        Civil Action No. 07-CIV-10959
                                                (Judge Rakoff)

                              Plaintiff,

        -against-                               **AFFIRMATION OF
                                                GEOFFREY S. POPE IN**
FEDERAL INSURANCE COMPANY,                      **OPPOSITION TO MOTION
                                                FOR SUMMARY JUDGMENT**

                              Defendant.
------------------------------------------------------------------X    ECF Case


        GEOFFREY S. POPE, a member of the bar of the State of New York and of the bar of

this Court, affirms under the penalties of perjury under the laws of the United States as follows:

        1.      I am counsel to Welby, Brady & Greenblatt, LLP, attorneys herein for the

plaintiff in the action.  I have personal knowledge of the matters set forth below.  This

affirmation is submitted, by leave of court (Hon. Jed F. Rakoff, U.S.D.J.) at oral argument held

on March 7, 2008, as the motion to dismiss made by defendant Federal Insurance Company

("Federal") is to be decided as one for summary judgment.

        2.      The Court having given broad latitude to the parties to address any such matters

as they deemed appropriate in light of the conversion of the motion from one under FRCP

12(b)(6) to one under FRCP 56, I will first address certain issues raised in Federal's Reply Memorandum of Law filed on February 29, 2008 (the "Reply").

3.    Plaintiff IWC's primary argument in opposition to Federal's motion (whether the same be one to dismiss or one for summary judgment) is that alternative dispute resolution (including but not limited to arbitration), however favored, is <u>not</u> imported into a subcontract via a general incorporation by reference (or "flow down") provision.  The intent to submit disputes to alternative dispute resolution proceedings must be "clear, explicit and unequivocal," and must not "depend upon implication or subtlety."  <u>General Railway Signal Corp. v. L. K. Comstock & Company, Inc.</u>, 254 A.D.2d 759, 678 N.Y.S.2d 208 (4th Dep't 1998), <u>leave dismissed</u>, 93 N.Y.2d 881, 689 N.Y.S.2d 424 (1999); *see also,* <u>Aerotech World Trade Ltd. v. Excalibur Systems, Inc.</u>, 236 A.D.2d 609, 654 N.Y.S.2d 386, 387 (2d Dep't 1997).

4.    The mere listing of an "upstream" contract that includes an alternative dispute resolution as a "contract document," without specific reference in the "downstream" contract (here, that between Federal's principal, Beys, and IWC)  to alternate dispute resolution falls far short of a "clear, explicit and unequivocal" expression of intent to submit any or all disputes to such procedures.  The Reply neither directs our attention to a genuinely "clear, explicit and unequivocal" contract provision, nor cites a case to support its argument (Reply at 1) that the identification in IWC's subcontract of the upstream contracts suffices to bind IWC to alternative dispute resolution.

5.    The Reply's lead argument, actually, is that IWC failed to find the prime (DDC-Hill) contract among the hundreds of pages of contract documents annexed to Federal's moving papers.  "IWC's inability to recognize the prime contract," Federal sniffs (Reply at 2) "may

certainly have contributed to its failure to understand that alternative dispute resolution procedures were set forth therein."

6.    Leaving aside what may be inferred concerning the parties' intentions at the time of contracting from the fact that IWC's lawyers failed to detect the prime contract in the mass of paper, it is of no consequence that IWC erroneously stated in its opposition Brief (at 3) that the DDC-Hill contract was missing.  First, IWC's opposition to Federal's motion has assumed that the DDC-Hill contract includes substantially the same provision as the next-tier, Hill-Beys contract.  Second, it is the lack of a clear and unambiguous requirement for alternative dispute resolution *in the Beys-IWC subcontract* that is the key.

7.    The Reply cites cases favoring arbitration or other alternative dispute resolution procedures generally, and, in particular, cites State v. Philip Morris, Inc., 30 A.D.2d 26, 813 N.Y.S.2d 71 (1st Dep't 2006) and Fairfield Towers Condominium Assn. v. Fishman, 1 A.D.3d 252, 769 N.Y.S.2d 214 (1st Dep't 2003) for the proposition that, in case of doubt regarding whether "an issue" is subject to ADR, the doubt must be resolved in favor of the process, Reply at 2.

8.    The favor with which ADR is regarded by the courts is not so pronounced that a party will be forced to forego litigation in favor of ADR,  except by a clear and unambiguous expression of intent to do so.  As the Appellate Division, Second Department stated in Aerotech World Trade Ltd., *supra,* 654 N.Y.S.2d at 387:

> New York public policy favors arbitration.  However, an agreement to arbitrate must be clear and unambiguous, and not dependent upon subtleties in the agreement.   While an agreement to arbitrate can be incorporated by reference, any such reference must clearly show such an intent to arbitrate  [citations omitted].

9.    Nor are the cases that Federal cites in the Reply to the contrary.  Philip Morris, *supra,* 30 A.D.2d 26, concerned the "Master Settlement Agreement" between states and tobacco

companies, resolving litigation in which the states sought monies from the tobacco companies to recoup health-care costs associated with tobacco use. As some but not all tobacco companies were parties to the settlement, the settlement contained, in subsection IX(j), what was defined as an "NPM Adjustment"[1] whereby, under certain defined conditions, the settling companies' payments might be reduced, to compensate them for the competitive disadvantage incurred by them in settling litigation to which "non-participating manufacturers" were not parties.

10.    The "NPM Adjustment" in <u>Philip Morris</u> was but one of a variety of calculations required to be made from time to time by an Independent Auditor, to give effect to the parties' exhaustively-negotiated settlement. The parties' settlement contained an expansive arbitration clause, whereby:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i) shall be submitted to binding arbitration . . .

30 A.D.3d at 28.

11.    The issue before the Appellate Division in <u>Philip Morris,</u> *supra,* 30 A.D.3d at 26, was not whether a vague incorporation by reference clause sufficed to require contracting parties to arbitrate based on provisions in the incorporated agreement. Rather it was "whether the arbitration clause in the [Master Settlement Agreement] applie[d] to determinations concerning specific application of downward adjustments to payments due from appellants," *id.* at 27. Among other things, as the so-called "NPM Adjustment" was set forth in subsection IX(j), and "adjustments [or] reductions . . . described in subsection IX(j)" were expressly enumerated as being within the scope of the arbitration clause quoted above (which clause, moreover, very

---

[1] The acronym refers to "Non-Participating Manufacturers."

broadly embraced any disputes arising out, of or relating to, calculations or determinations by the Independent Auditor) the Appellate Division reversed an order by Supreme Court, that had denied the tobacco companies' motion for arbitration. While the Appellate Division's decision *did* remark, in passing, that "doubts as to whether an issue is arbitrable will be resolved in favor of arbitration," 30 A.D.3d at 31 (citation omitted) in <u>Philip Morris</u> the incorporation by reference was unmistakably clear (as it referred to the numbered subsection IX(j) that provided for the NPM Adjustment). A second distinction between <u>Philip Morris</u> and the contracts at bar is that the arbitration clause *in addition to* referencing the very subsection in which the NPM Adjustment was provided for made clear that *any* calculations or determinations by the Independent Auditor were subject to arbitration. Third, the cross-references at issue were contained within a single, laboriously-negotiated agreement, hammered out at arm's length by counsel for the country's largest tobacco companies, and a number of government agencies. At bar, of course, the incorporation by reference was between or among agreements, most of the terms of which were essentially imposed from above by DDC (and certainly not negotiated by IWC at arm's length, or even with the assistance of legal counsel).[2]

12.     Similarly, the other case relied on by Federal, <u>Fairfield Towers,</u> *supra,* 1 A.D.3d at 252, in no way is in derogation of the rule that a party cannot be required to submit to arbitration (or other ADR proceedings) absent its clear and unambiguous intent to do so. In that case, a collective bargaining agreement provided for "counsel fees and court costs" as might be incurred in a successful suit to compel compliance with an arbitration award rendered pursuant to the agreement. The union commenced an arbitration against the employer, prevailed in a federal court proceeding to confirm the award, and further demanded arbitration, pursuant to the CBA,

---

[2] *See* Supplemental Affidavit of Michael Vicario, sworn to on April 2, 2008, which accompanies the present affirmation.

of a claim for counsel fees and court costs incurred by it in the confirmation proceeding. 1 A.D.3d at 253.

13.    The IAS court in <u>Fairfield Towers,</u> *supra,* 1 A.D.3d at 253, granted a motion by the employer to stay arbitration of the claim for attorneys' fees and court costs, stating that the CBA "[did] not empower the arbitrator to make such awards," *id.* The Appellate Division reversed, finding in relevant part as follows (*id.* at 253):

> The CBA provides that "all differences arising between the parties . . . as to interpretation, application or performance of any part of this agreement" shall be resolved through arbitration, and empowers the arbitrator to "award appropriate remedies." As the union's claim for its counsel fees and court costs in the confirmation proceeding involves the "interpretation, application or performance of [a] part of [the CBA]," the instant dispute is arbitrable under the DBA.

14.    Thus, while <u>Fairfield Towers</u> likewise contains a statement to the effect that ambiguities would be resolved in favor of arbitrability, *id.,* that comment is almost certainly *dictum* and, in all events, <u>Fairfield Towers</u> is <u>not</u> about the sufficiency of a non-specific incorporation by reference clause to require parties to one agreement to submit to ADR, based on an ADR provision in a related agreement between different parties.

15.    IWC argued in its brief that the alleged incorporation of procedures to submit disputes successively to the commissioner, comptroller, and Contract Dispute Resolution Board, with access to the courts limited to an Article 78 proceeding (governed by a deferential, "arbitrary and capricious" standard of review) is inconsistent with the reference in Subcontract 21.3 to an "action or proceeding," which is to be "brought in accordance with [unspecified] terms and provisions contained in the Contract Documents." From this, IWC argued further that the ambiguity must be resolved against Beys, under the rule of *contra proferentum,* and the Court should reject an interpretation that limits IWC to the constricted "Article 29" remedies.

16.    Federal's exertions in its Reply, in trying to wrestle with the ambiguity just described, if anything underscores that, however one might struggle to interpret Subcontract 21.2 to require ADR (but only as to disputes of the kinds mentioned in the prime contract in Article 29.1.2) such interpretation cannot, by any stretch of the imagination, be fairly characterized as "clear, explicit and unequivocal."  "The contract provisions," we are assured by Federal (Reply at 3-4) "taken together make it crystal clear that Beys expected all of its subcontractors, including IWC, to participate in the alternate resolution process where disputed DDC change orders were involved."

17.    "Crystal clear" is a gross overstatement.  Just how that might be so is not adequately explained.  First, the "flow-down" provision, Subcontract Article 21.2, refers to "Contract Documents" *en gros,* not to a particular type of dispute referred to in Article 29.1.2.  If Beys wished to make it "crystal clear" or ("clear, explicit and unequivocal") that disputes (but only such kinds of disputes) as are mentioned in Article 29.1.2 were required to be submitted for decision to the Commissioner, the Comptroller, and the Contract Dispute Resolution Board, it had available two ready means (and probably no others) of doing so.  It could have, for example, paraphrased the language of Article 29.1.2, to state in Subcontract 21.2 substantially as follows:

> 21.2  If a dispute or disputes shall arise hereunder, if but only to the extent that the same shall be about the scope of work delineated by the Contract Documents; amounts to be paid to the Subcontractor for Extra Work or disputed work; the conformity of the Subcontractor's Work to the Contract Documents; or the acceptability and quality of the Subcontractor's Work; as the same implicate the interests of the City, the Subcontractor shall be required to avail itself of the provisions of Article 29 of the Prime Contract, "Resolution of Disputes," and the Procurement Policy Board (PPB) Rules as its sole remedy.

18.    Following the proposed substitute language just quoted, the Subcontract — to be "crystal clear" — could have set forth at length, and with only such changes as indicated by IWC's status as "Subcontractor" rather than "Contractor," the Article 29 procedures detailed in

the Prime Contract. That, certainly, would have left no doubt[3] concerning how disputes implicating the City's interests would be resolved.

19.    In the alternative, rather than merely gesturing in the general direction of some hundreds of pages of "Contract Documents," if it intended to make "crystal clear" that disputes limited to the kinds mentioned in Article 29.1.2 of the Prime Contract would be subject to ADR, in accordance with the Article 29/PPB Rule procedures, it would have been sufficient for Beys to state in the Subcontract substantially as follows:

> 21.2 If a dispute or disputes shall arise hereunder, if but only to the extent that the same shall be about those matters mentioned in Article 29.1.2 of the Prime Contract, the Subcontractor shall be required to avail itself of the provisions of Article 29 of the Prime Contract, "Resolution of Disputes," and the Procurement Policy Board (PPB) Rules as its sole remedy.[4]

20.    Also, in scurrying to escape the rule of *contra proferentum,* the Reply endeavors to explain away the ambiguity between Subcontract Article 21.2 (with its reference to a lawsuit and to a shortened limitations period) by recalling that disputes in no way involving the City, or outside the list set forth in Article 29.1.2 of the Prime Contract, *could* be asserted in the first instance in litigation. *See* Reply at 4-5 (". . . there are entire categories of claims," for example, delay claims, "which would not be subject to the [Article 29] dispute resolution procedure."

---

[3] Except, of course, as to the issue of how difficulties in using procedures designed for use by parties in privity with the City would be overcome.

[4] The approaches just commended would not, concededly, have been wholly satisfactory without more, as they leave unaddressed the mechanics of how IWC would, in asserting claims that are at bottom claims against the City, bridge not one but two gaps in the "chain of privity." Thus, the Subcontract (as well as Beys' agreement with Hill) ought to have contained an express covenant by Beys (and Hill) to render all assistance and to enter into a "liquidating agreement" with downstream parties as reasonably necessary to enable IWC (as well as other subcontractors) to get the substance of disputes involving the City's interests into the Article 29 dispute resolution mechanisms. However, while not fully effective to provide an adequate mechanism to make the Article 29 procedures of potential use to IWC, the language proposed in paragraphs 17 and 19 hereof *does* make clear, as the Subcontract as written does not, that disputes (such as that at bar involving DDC disapproval of a change order) *were intended to be* governed by Article 29.

21.    The primary importance of this last-mentioned concession is that, as set forth in the Supplemental Affidavit of Michael Vicario, although the greater part of the claims at bar <u>do</u> concern the change order for increased costs in unloading and installing the curtain wall, <u>elements of IWC's claims at bar are outside the scope of Article 29.1.2; wherefore, assuming</u> <u>*arguendo* that Federal's arguments were to be accepted by the Court, those elements of IWC's</u> <u>claim would survive nonetheless.</u>

22.    The entire argument (that the Subcontract is without ambiguity, because the range of disputes required to be sent to ADR is less than all-inclusive) bears the distinct aroma of an afterthought borne of desperation.  Certainly, several references in Federal's main brief (as well as the fact that it has moved to dismiss claims including elements plainly not within the range of matters mentioned in Article 29.1.2) suggest that it was only in preparing the Reply that Federal retreated, of necessity, to the position that most, but not all, disputes are embraced by the ADR requirement.  *See* Federal's Main Brief at p. 7 ("any claims"); *id.,* p. 8 ("neither the Payment Bond, nor any of the contract documents permit IWC to pursue remedies through judicial proceedings without first pursuing a resolution within the procedures set forth by the Prime Contract"); *id.,* p. 10 ("procedures mandated by the Prime Contract constitute the sole remedy available to plaintiff in order to resolve disputes").

23.    The fallacy of Federal's "no ambiguity" argument is most conspicuously apparent from the language of Subcontract 21.2, to the effect that, "[t]o the extent that any dispute arises *hereunder* and a suit is instituted thereby, it shall be brought in accordance with the terms and provisions contained in the Contract Documents" (emphasis supplied).  In the Reply (at pp. 4-5) Federal tries to argue that, actually, the Subcontract's purported ADR clause "does not cover any disputes involving issues strictly between Beys and IWC." As such a claim would be one arising

9

solely "hereunder," i.e., from the Beys-IWC Subcontract, how is it that Beys felt the need, in Subcontract Article 21.2, to refer back to "terms and conditions contained in the Contract Documents"?   In Federal's main brief (at p. 7) the alleged necessity to have general contractors impose the Article 29 procedures on subcontractors is asserted to be the avoidance of potentially inconsistent results, in situations "such as this one involving disputed change orders" (which is to say, situations in which the City's interests are involved).   However, given that no City interests are implicated where the dispute is solely between a subcontractor (such as Beys) and a lower-tier subcontractor (such as IWC) (which disputes even Federal, lately, acknowledges are not subject to ADR using the Article 29 procedures) what, then, is the point in providing, in Subcontract Article 21.2, that disputes arising from the Beys-IWC Subcontract (without distinction as between those solely involving issues as between IWC and Beys, and those including some admixture of issues in which the City's interests are at issue) must conform to procedures in the Prime Contract?   Whatever sense might be wrested from this language, "clear" or "unambiguous" it is not.

24.    IWC's opposition Brief argues that imposing Rule 29 procedures on IWC should be disfavored as a construction that places IWC at the mercy not only of Beys, the only party with whom IWC is in contractual privity, but in addition that of Hill, the second intermediary "link" between IWC and DDC in the "chain of privity."   This is, of course, because IWC, lacking privity with DDC, would not have standing to pursue PPB/Article 29 remedies, or an Article 78 proceeding, directly against the City.   So far as IWC has knowledge, the sole mechanism whereby it would ever be able to assert claims against DDC, whether in a court action or via the PPB rules, would necessitate that each of Beys and Hill enter into a "liquidating agreement," requiring a formal (if *pro forma)* admission of liability to the party immediately

"downstream" (*i.e.*, Beys in the case of Hill, and IWC in the case of Beys) in order to bridge the gaps in the privity chain. *See* North Moore Street Developers, LLC v. Meltzer/Mandl Architects, P.C., 23 A.D.3d 27 (1st Dep't 1995) and additional authorities cited in IWC's Brief at pp. 13-14. IWC does not find in the swamp of "Contract Documents," nor has Federal cited, any liquidating agreement (or covenant to enter into a liquidating agreement, if necessary to enable IWC to make *effective* use of the Article 29 procedures).

25.     Federal's Reply offers no explanation of why the Commissioner, the Comptroller, the Contract Disputes Resolution Board or Supreme Court (in an Article 78 proceeding) would address, let alone make payment on, a claim by a lower-tier subcontractor lacking both direct privity, or privity constructed from an unbroken link of "liquidating agreements" with the City. Nor does Federal dispute that there was not a liquidating agreement between Beys and IWC, nor anything in the Subcontract requiring Beys to enter into a liquidating agreement.[5]

26.     Instead, Federal argues that the entire issue is moot (as IWC sued instead of pursuing the Article 29 remedies); that Beys and Hill "participated in" or "cooperated with" the initial submission to DDC or IWC's proposed change order; and that IWC is ignoring Beys' (and Hills') (unspecified) "incentive . . . to ultimately enter into liquidating agreements if necessary," Reply at 6.

27.     Federal, citing Arbitron Inc. v. Tralyn Broadcasting, Inc., 526 F.Supp.2d 441 (S.D.N.Y. 2007) and CSI Investment Partners II, LP v. Cendant Corp., 507 F.Supp.2d 384 (S.D.N.Y. 2007) adverts to the implied covenant of good faith and fair dealing and, essentially begging the question (while upbraiding *IWC* for speculating as to the future conduct of Beys and

---

[5] Or even less specific language, requiring Beys to afford IWC, the latter having a dispute requiring submission to the Article 29 procedures, to provide all such lawful assistance and cooperation reasonably necessary to enable IWC the benefit of such procedures.

Hill, *id.* at 7) concludes that *of course* both intermediate parties would have entered into liquidating agreements, as to not do so "would potentially violate the implied duty of good faith," Reply at 7.

28.    All of these arguments, as well as the two irrelevant cases cited, are entirely beside the point. Neither <u>Arbitron Inc.,</u> 526 F.Supp.2d 441, nor <u>CSI Investment Partners,</u> *supra,* 507 F.Supp.2d 384 has anything to do with liquidating agreements as necessities to bridge gaps in contractual privity in a construction (or any) context. Although <u>Arbitron</u> is but one of a host of cases for the proposition that "[u]nder New York law, the implied covenant of good faith and fair dealing in a contract only precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement," certainly from the scanty case law cited it is unclear whether, or to what extent, a party must *affirmatively aid* another in realizing the benefits of the agreement (as opposed from merely avoiding affirmative acts *that would deprive the other party of those benefits*). *Query* if the downstream contractor accepts to be governed by ADR procedures really only intended for use where the City is one of the parties, but neglects to obtain from the upstream contractor a covenant to enter into a liquidating agreement (if necessary, to enable the subcontractor from actually getting its claim before the Commissioner, the Comptroller, *et al.)* has any reported case held that a later refusal by the upstream contractor to enter into a liquidating agreement constituted a breach of the subcontract (based on the implied covenant of good faith and fair dealing)?  No such case has been cited by Federal here.

29.    Also, assuming that Beys might have felt an obligation, based on its contract relationship with IWC and the implied covenant of good faith and fair dealing, to enter into a liquidating agreement, so doing would have accomplished nothing, had Hill — which, having no contract with IWC, was not subject to an implied covenant that could be asserted in an action by

IWC — simply determined that IWC's problems with the City were not its problems, and it did not care to enter into a liquidating agreement (which does, after all, require an admission of liability, as not every contractor understands is essentially *pro forma*). The Reply does not edify us as to that eventuality.

30.     Neither Federal's argument based on the implied covenant, nor any other argument made by it in Point III of its Reply, inflicts the slightest dent on IWC's argument, which is this: requiring IWC to submit claims to PPB procedures would require purely voluntary acts (including, almost certainly, entering into a liquidating agreement) not only by Beys, but also by Hill. As the Subcontract contains no requirement that *Beys* enter into any liquidating agreement, and IWC (lacking privity with Hill) had no apparent means to require that *Hill* do so, the contract interpretation urged by Federal left IWC at the mercy of both Beys and Hill. However estimable, or well-disposed toward IWC, as those parties may be claimed to have been, interpretations of contract provisions that expose one party to the mercies of any other party should be disfavored, and so that interpretation proffered here by Federal should be disapproved.

31.     At oral argument on March 7, 2008, Judge Rakoff inquired whether IWC had had the assistance of counsel in reviewing and entering into the Subcontract. As set forth in the Supplementary Affidavit of Michael Vicario, submitted herewith, the answer to that inquiry is that it did not.

32.     Also, the supplementary affidavit of Mr. Vicario dispels the suggestion in Federal's papers that the action is solely about change orders not approved by DDC, and therefore had to be brought for resolution under the PPB Rules. As Mr. Vicario points out (*see* Supplemental Affidavit at ¶¶ 8-11 and Exhibit A thereto) although the $138,000 change order is

the largest component of IWC's overall claim, an unpaid contract balance and retainage totaling $75,599.42 is also part of the same.

33.    As Federal's papers affirmatively argue that disputes solely between IWC and Beys/Federal are not within the class of disputes it claims could only be resolved through the Article 29 procedures, the existence of this element of the claim flatly negates any argument that the action should be dismissed in its entirety.

34.    IWC does not take issue with the Court's determination that, generally as the Complaint at bar does not advert sufficiently to the several contracts to afford the Court, or an appellate court reviewing a determination by the district court, a sufficient record, wherefore this motion is more appropriately determined as one for summary judgment than as one for dismissal under FRCP 12(b)(6).  Respectfully, however, IWC asks the Court to keep in mind that where, as IWC proposes is the case here, extrinsic evidence may be received in aid of what the parties intended, where the same "will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court," City of New York v. Evanston Ins. Co., 39 A.D.3d 153, 156, *quoting* State of New York v. Home Indem. Co., 66 N.Y.2d 669, 671.  And, where all contract terms cannot be harmonized, and "consideration of extrinsic evidence serves no worthwhile purpose," Oakgrove Constr., Inc. v. Genesee Valley Nurseries, Inc., 10 Misc.3d 1053(A), 2005 WL 3240283 at *4-5, the Court appropriately construes the agreement against the drafter.

35.    For the foregoing reasons, and those set forth in the accompanying Supplemental Affidavit of Michael Vicario and IWC's papers previously submitted in opposition to Federal's motion, the same should be in all respects denied.

GEOFFREY S. POPE

Dated:      White Plains, New York
            April 3, 2008