UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
INDUSTRIAL WINDOW CORP.,

                                           Plaintiff,

            -against-

FEDERAL INSURANCE COMPANY,

                                     Defendant.

-----------------------------------------------------------------------X

Case No.:  07 CV 10959
(Rakoff, J.)


**SUPPLEMENTAL
AFFIDAVIT OF GEORGE
KOUGENTAKIS**

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF KINGS       )

George Kougentakis, being duly sworn, deposes and says the following:

1.      I am the President of Beys General Construction Corp. ("Beys").  I submit this affidavit in further support of the motion by defendant Federal Insurance Company ("Federal") for an order dismissing the Complaint of the plaintiff, Industrial Window Corp. ("Industrial"), as against Federal on the ground that the action is barred by the resolution of dispute provisions included in the subcontract between IWC and Beys.

2.      As requested by the Court during oral argument of the motion to dismiss on March 7, 2008, enclosed as Exhibit "A" is a signed copy of the contract between Hill International, Inc. ("Hill") and Beys.

3.      We understand that the Court also requested additional information concerning the formation of our subcontract with Industrial.  At the outset of the project, we learned that the curtain wall manufacturer suggested in the bid package was no longer in business.  After scouring the country for a replacement, we found UAD Group and submitted them for approval.  We initially received approval on July 11, 2005.  That approval was subsequently rescinded by NYC DDC and the New York Public Library in

September of 2005.  The architect, Richard Dattner Partners, who was the moving force behind the rejection, then strongly suggested we use D&D Architectural Products ("D&D") as a replacement for UAD.  We discovered that D&D had only been in business for four months and intended to fabricate the curtain wall in Taiwan.  Although we complained vehemently to Hill in a September 26, 2005 letter (annexed hereto as Exhibit "B") that we were being forced to use a proprietary system costing about $370,000.00 more from a novice company based outside the United States, we were threatened with default if D&D was not used.  D&D was unable to get bonding and offered to use Industrial to provide bonding for the subcontract and to do the actual installation.

4.     Although I have no personal knowledge of whether Industrial used the services of an attorney to review our proposed subcontract, Ray Beninato of Industrial did send us numerous proposed changes to the contract.  (See October 7, 2005 memo annexed hereto as Exhibit "B").  Thus, it is clear that Industrial spent significant time reviewing the terms of the contract.  Given the leverage that Industrial/D&D had as essentially the sole source for this aspect of the work on the project, it certainly could have sought changes with regard to the obligation to pursue change orders through the alternate dispute resolution process or included specific language indicating that it would not agree to be bound by the alternate dispute provisions.

5.     After the subcontract was signed, at least five (5) Industrial change orders on the project were submitted and approved through review by Hill and subsequently by DDC.  This demonstrates Industrial's understanding that resolution of change orders needed to be handled through the specified contractual methods.  Those five change

orders are referenced in the November 14, 2007 letter from Industrial's attorney which was annexed as Exhibit E to my moving affidavit. It follows that Industrial would have reviewed and familiarized itself with the provisions in the contract respecting resolution of disputed change orders.

6. With regard to the curtain wall logistic change order, which is the primary item in dispute, all negotiations for this change order took place directly between Industrial and Hill/DDC. Again, this indicates Industrial's familiarity with the need to obtain owner approval for change orders.

7. Beys believes that Section 21.2 of the subcontract, as well as Sections 1.1 and 2.2, made it clear that any dispute involving approval of a change order by DDC would be resolved by a specific alternate dispute procedure. Given the extensive time it apparently spent reviewing the subcontract, it is disingenuous for Industrial to now attempt to pick and choose which contract provisions it wants to follow.

George Kougentakis

Sworn to before me this
4th day of APRIL, 2008

Notary Public

IOANNA KATSIMBRAKIS
Notary Public, State of New York
No. 01KA5069243
Qualified in Richmond County
Commission Expires Nov. 25, 2010



**IV. AGREEMENT**

**BETWEEN**

**HILL INTERNATIONAL, INC.**
**AND**
**BEYS GENERAL CONSTRUCTION CORP.**

THIS AGREEMENT is made and entered into as of April 20, 2005 by Hill International, Inc. (hereinafter called the "CONTRACTOR") and Beys General Construction Corp. (hereinafter called the "SUBCONTRACTOR").

WHEREAS, On February 11, 2004 CONTRACTOR has entered into an Agreement (the "Client Agreement") with the City of New York (hereinafter called the "CITY"), acting by and through the Commissioner of the Department of Design and Construction (hereinafter called the "COMMISSIONER") for Schomburg Center for Research in Black Culture (hereinafter called the "PROJECT"). WHEREAS, CONTRACTOR desires to secure the services of SUBCONTRACTOR in connection with the PROJECT;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the parties hereto agree as follows:

**ARTICLE 1 - WORK**

The Work shall include all General Construction work at the Schomburg Center. SUBCONTRACTOR shall complete all Work as specified or indicated in the Contract Documents as set forth in Article 8.

**ARTICLE 2 - ARCHITECT/ENGINEER (A/E)**

The Project Designer is as indicated in the Technical Specifications Package, (hereinafter called the A/E) and will, assume all duties and responsibilities and have the rights and authority assigned to the A/E in the Contract Documents in connection with completion of the Work.

**ARTICLE 3 - CONTRACT TIMES**

3.1    Term. This Agreement shall become effective on the date first above written and shall continue until final acceptance by the COMMISSIONER of all required construction work, unless terminated sooner in accordance with the Contract Documents. The required dates for Substantial Completion and Final Acceptance of the Work are indicated in the Contract Documents.

3.2    Liquidated Damages. SUBCONTRACTOR and the SUBCONTRACTOR's Surety, if any, shall be liable for and shall pay the CONTRACTOR the sums stipulated as liquidated damages as set forth in the Contract Documents for each calendar day of delay until the Work is complete. SUBCONTRACTOR and

CAPIS I.D. LM001SCHO
Schomburg Center for Research in Black Culture
CONTRACT # 1-General Construction
February 2005

CONTRACTOR agree that said liquidated damages shall be for loss of a bargain and not as a penalty.

3.3    Time Extensions shall be resolved in accordance with the Client Agreement.

## ARTICLE 4 – INDEMNIFICATION

SUBCONTRACTOR shall be responsible for and shall indemnify and hold harmless CITY, NEW YORK PUBLIC LIBRARY, and CONTRACTOR, their respective officers, agents and employees, from and against:

(a) any and all liability imposed by reason of actual or asserted violation of laws, regulations, ordinances or other rules of any government or quasi-governmental body or agency, including actual or alleged failure to pay taxes as herein provided; and

(b) any and all liability, damage, loss, cost, expense, claim, demand, suit, action, judgment, or recovery (including, but not limited to, reasonable attorney and consultant fees) for or on account of any injury or death of persons or damage to property, including, but not by way of limitation, damage to property of SUBCONTRACTOR, CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CONTRACTOR or others, or injury, death, or damage to property of CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CONTRACTOR or SUBCONTRACTOR's officers, agents, employees, sub-subcontractors or representatives, arising out of, or in any way occurring directly or indirectly in connection with the Work, including without limitation, delegable or nondelegable duties imposed on SUBCONTRACTOR, CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CONTRACTOR by law, except for such injury, death or damage as it is caused by the sole negligence of CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and/or CONTRACTOR; and SUBCONTRACTOR shall at its sole expense defend any and all actions based thereon. Any loss or damage incurred by CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and/or CONTRACTOR in connection with the foregoing may be deducted from SUBCONTRACTOR's compensation then due or thereafter to become due, in addition to any other remedies that CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and/or CONTRACTOR may have.

(c) CITY, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CONTRACTOR shall not be liable to SUBCONTRACTOR in contract, tort, or otherwise (including negligence, warranty, or strict liability) for any incidental, special, punitive, indirect or consequential damages or for loss of profits or revenues arising out of or in connection with or resulting from this Agreement and/or the Work.

## ARTICLE 5 - CONTRACT PRICE

CONTRACTOR shall pay SUBCONTRACTOR for completion of the Work in accordance with the Contract Documents, an amount in current funds not to exceed the sum of
**Four Million Five Hundred Sixty-Nine Thousand dollars ($4,569,000.00)**

## ARTICLE 6 - PAYMENT PROCEDURES

AGREEMENT
IV. - 3

6.1   Applications for Payment: SUBCONTRACTOR shall submit Applications for Payment in accordance with the General Conditions. Applications for Payment will be processed by CONTRACTOR as provided in the General Conditions.

6.2   Progress Payments: Payment shall be on the basis of and in proportion to the percentage of completion of all required construction work, as determined by the CONTRACTOR, subject to the retainage specified in Article 6.3 hereof. Partial payments will be based on an approved detailed trade payment breakdown for the Project. Partial payments may be made for materials, fixtures and equipment in advance of their actual incorporation in the work, as the COMMISSIONER may approve, and upon the terms and conditions provided for in the Contract Documents.

6.3   Retainage: As security for the faithful performance of this agreement, the CONTRACTOR shall deduct and retain **5%** of the value of the construction work certified for payment in each Application for payment. Upon final acceptance of the Work, as determined by the CONTRACTOR, the CITY shall release amounts retained for payment to SUBCONTRACTOR, less any cost to cover any outstanding punch list work or other work as determined by the CONTRACTOR.

6.4   Final Payment. Upon final completion and acceptance of the Work in accordance with the Contract Documents, CONTRACTOR shall pay the remainder of the Contract Price less security as defined in the Contract Documents.

6.5   Provided that the SUBCONTRACTOR submits Applications for Payment in accordance with the Contract Documents, CONTRACTOR shall pay SUBCONTRACTOR not later than seven (7) days after receipt of payment out of amounts paid to the CONTRACTOR by the CITY for work performed by the SUBCONTRACTOR under this AGREEMENT.

## ARTICLE 7 - SUBCONTRACTOR'S REPRESENTATIONS

In order to induce CONTRACTOR to enter into this Agreement, SUBCONTRACTOR makes the following representations:

7.1   SUBCONTRACTOR has examined and carefully studied the Contract Documents and the other related data identified in the Bidding Documents including "technical data."

7.2   SUBCONTRACTOR has visited the site and has become familiar with and is satisfied as to the general, local and site conditions that may affect cost, progress, performance or furnishing of the Work.

7.3   SUBCONTRACTOR is familiar with and is satisfied as to all federal, state and local Laws and Regulations that may affect cost, progress, performance and furnishing of the Work.

7.4    SUBCONTRACTOR is aware of the general nature of work to be performed by CONTRACTOR and others at the site that relates to the Work as indicated in the Contract Documents.

7.5    SUBCONTRACTOR has correlated the information known to SUBCONTRACTOR, information and observations obtained from visits to the site, reports and drawings identified in the Contract Documents and all additional examinations, investigations, explorations, tests, studies and site inspections with the Contract Documents.

7.6    SUBCONTRACTOR has given CONTRACTOR written notice of all conflicts, errors, ambiguities or discrepancies that SUBCONTRACTOR has discovered in the Contract Documents and the written resolution thereof by CONTRACTOR is acceptable to SUBCONTRACTOR, and the Contract Documents are generally sufficient to indicate and convey understanding of all terms and conditions for performance and furnishing of the Work.

7.7    SUBCONTRACTOR has the resources and experience to perform the scope of work as defined by the Contract Documents, and shall do so within the CONTRACT TIMES set forth in the Contract Documents.

7.8    SUBCONTRACTOR bears all risk and responsibility for passing and maintaining a satisfactory VENDEX report from the CITY for itself and its subcontractors. The SUBCONTRACTOR also agrees that the CONTRACTOR may declare the SUBCONTRACTOR in default of its contract if it does not achieve and maintain a satisfactory Vendex rating from the CITY.

## ARTICLE 8 - CONTRACT DOCUMENTS

8.1    The Contract Documents which comprise the entire agreement between CONTRACTOR and SUBCONTRACTOR concerning the Work consist of the following:

   8.1.1    This Agreement.

   8.1.2    Performance, Payment, and other Bonds.

   8.1.3    Notice of Award.

   8.1.4    Notice to Proceed.

   8.1.5    The entire Project Manual which includes, but is not limited to, Bidding Requirements, Contract Requirements, Contract Forms, General Conditions and the Addendum to the General Conditions.

   8.1.6    Drawing set.

   8.1.7    Addenda.

8.1.8   The following which may be delivered or issued after the Effective Date of the Agreement and are not attached hereto: All Written Amendments and other documents amending, modifying or supplementing the Contract Documents.

8.1.9   Client Agreement.

8.2   The documents listed in paragraph 8.1 above are attached to this Agreement (except as expressly noted otherwise above).

8.3   In case of conflicts between the Contract Documents, the order of precedence shall be as follow:

8.3.1   Approved modifications or changes last in time.

8.3.2   Client Agreement .

8.3.3   Addenda.

8.3.4   Addendum To The General Conditions.

8.3.5   General Conditions.

8.3.6   Technical Specifications.

8.3.7   Drawings: as between figures given on drawings and the scaled measurements, the figures shall govern; as between large-scale drawings and small-scale drawings, the larger scale shall govern; as between detailed drawings and standard plates bound within the specifications, the detailed drawings shall govern.

8.3.8   In the event provisions of codes, safety orders, Contract Documents, referenced manufacturer's specifications or industry standards are in conflict, the more restrictive and higher quality shall govern. CONTRACTOR shall be consulted for approval of design intent.

## ARTICLE 9 – INCORPORATION OF CLIENT AGREEMENT

9.1   To the extent applicable to the Work to be performed by SUBCONTRACTOR under this Agreement, the provisions of the Client Agreement, addenda, amendments and other documents forming a part of the Client Agreement are hereby incorporated into this Agreement with the same force and effect as though set forth in full herein.   SUBCONTRACTOR shall be bound to CONTRACTOR, to the same extent that CONTRACTOR is bound to the CITY, by all of the terms and provisions of the Client Agreement, and by all decisions, rulings, and interpretations of CITY or it's authorized representative.  A copy of the Client Agreement is attached hereto.

AGREEMENT
IV. - 6

## ARTICLE 10 - INSURANCE

10.1    Insurance Required  - Without limiting SUBCONTRACTOR's indemnification set forth in Article 4 and in accordance with the Client Agreement, SUBCONTRACTOR shall, at all times during the term of this Agreement and extended terms thereof, provide and maintain at it's own cost and expense, the following types of insurance protecting the interests of CONTRACTOR, with limits of liability not less than those specified below"

   10.1.1 Worker's Compensation Insurance as statutorily required, insuring against any and all claims of workers for compensation arising out of workers' compensation claims.

   10.1.2 Employees Liability Insurance in the minimum amount of $1,000,000 per occurrence.

   10.1.3 Comprehensive/Commercial General Liability Insurance in the minimum amount of $1,000,000 per occurrence combined single limit for bodily injury and property damage, $2,000,000 aggregate.

   10.1.4 Automobile Liability Insurance in the minimum amount of $1,000,000 for any hired, owned, or non-owned vehicles used in performance of the work.

   10.1.5 Builder's Risk Insurance, if required, in an amount equal to the Contract Price.

   10.1.6 Environmental Insurance, if required, as set forth in the attached Insurance Exhibit.

   10.1.7 Professional Liability Insurance, if required, as set forth in the attached Insurance Exhibit

   10.1.8 Railroad Protection Liability Policy (ISO-Rima or equivalent). The use of any equivalent to ISO-RIMA must provide equal or superior coverage. Liability limit shall be $3,000,000 each occurrence with a $6,000,000 aggregate.

10.2    Certificate of Insurance – Before commencing performance of this Agreement and/or entering upon the PROJECT site, the SUBCONTRACTOR shall provide Certificates of Insurance in form and content satisfactory to CONTRACTOR, evidencing all coverages stated above. Certificates of Insurance shall reference CONTRACTOR **Project No. LM001SCHO** and be submitted to:

Hill International, Inc.
One Penn Plaza
Suite 3415
New York, NY 10119

AGREEMENT
IV. - 7

Attention: Insurance Administrator
Until satisfactory evidence of insurance in force is received, CONTRACTOR will stop processing this Agreement and/or SUBCONTRACTOR payments.

10.3    Additional Insured Endorsement – By means of policy endorsement, the SUBCONTRACTOR's General Liability policy shall name CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY, their officers, employees, and agents as Additional Insureds as respects operations performed by or on their behalf of SUBCONTRACTOR in the performance of this Agreement.

10.4    Notice of Cancellation – Policies and/or certificates must specifically provide to CONTRACTOR a **sixty (60)** day notice of cancellation, non-renewal, or material change.

10.5    SUBCONTRACTOR hereby releases and waives all rights of subrogation against CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY possessed by SUBCONTRACTOR's Insurers with respect to the assumption and discharge of the obligations of SUBCONTRACTOR under this Article 10, and SUBCONTRACTOR hereby represents to CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY that it is authorized to make such release and waiver under SUBCONTRACTOR's policies of insurance.

## ARTICLE 11-PAYMENT AND PERFORMANCE BONDS

SUBCONTRACTOR shall furnish a Performance Bond in an amount at least equal to one hundred percent (100%) of the Contract Price herein as security for the full, faithful and timely performance of the Agreement; and also a Labor and Material Payment Bond in an amount at least equal to one hundred percent (100%) of the Contract Price for the payment of all persons performing labor or providing materials to the SUBCONTRACTOR or its subcontractors in connection with the Work, each such bond to be in the form as may be acceptable to CONTRACTOR. The surety on such bond shall be authorized to transact business as a surety in the State of New York and be subject to approval by the CONTRACTOR. Premiums due and payable under such bonds are to be paid by SUBCONTRACTOR and are included in the Contract Price.

## ARTICLE 12 – ASSIGNMENT

12.1    SUBCONTRACTOR shall not enter into any subcontract for performance of any part of the Work without the prior written approval (including, in the case and time of material subcontractors, the prior written approval of all charges and fees associated therewith) of CONTRACTOR. No such approval shall relieve SUBCONTRACTOR from any of its obligations pursuant to this Agreement and SUBCONTRACTOR shall continue to be primarily responsible to CONTRACTOR for all portions of the Work whether or not subcontracted by it. SUBCONTRACTOR agrees to bind each of its subcontractors to the provisions of this Agreement, unless otherwise authorized by CONTRACTOR in writing.

AGREEMENT
IV. - 8

12.2    SUBCONTRACTOR shall not assign this Agreement In whole or in part, or any monies to become due hereunder, without the prior written consent thereto of CONTRACTOR. Any purported assignment without such prior consent shall be void. CONTRACTOR shall have the right to assign this Agreement without the consent of the SUBCONTRACTOR, however CONTRACTOR shall be obligated to provide notice of such assignment, if any, to SUBCONTRACTOR.

## ARTICLE 13 – MISCELLANEOUS

13.1    Terms used in this Agreement which are defined in the General Conditions shall have the same meanings as set forth in the General Conditions.

13.2    CONTRACTOR and SUBCONTRACTOR each binds itself, its partners, successors, assigns and legal representatives to the other party hereto, its partners, successors, assigns and legal representatives in respect to all covenants, agreements and obligations contained in the Contract Documents.

13.3    Any provision or part of the Contract Documents held to be void or unenforceable under any Law or Regulation shall be deemed stricken, and all remaining provisions shall continue to be valid and binding upon CONTRACTOR and SUBCONTRACTOR, who agree that the Contract Documents shall be reformed to replace such stricken provision or part thereof with a valid and enforceable provision that comes as close as possible to expressing the intention of the stricken provision.

13.4    This Agreement, including the Contract Documents as specified in Article 8 above, constitutes the entire and integrated agreement between the parties and supersedes all prior negotiations, representation, or agreements, either written or oral.

13.5    All notices or other communications to either party by the other shall be deemed given when made in writing personally delivered, faxed or mailed, postage paid, to:

**CONTRACTOR**

Hill International, Inc.
One Penn Plaza
Suite 3415
New York, NY 10119
Phone: (212) 244-3700
Fax: (212) 244-3740
Attn: Mr. D. Clarke Pile, Senior Vice President

**SUBCONTRACTOR**

Beys General Construction, Corp.
2520 Coney Island Avenue
Brooklyn, NY 11223
Phone: (718) 627-7780
Fax: (718) 336-5960
Attn: Mr. Eleftherios Kougentakis, Secretary

13.6    SUBCONTRACTOR shall remain an independent contractor and shall have no power, nor shall SUBCONTRACTOR represent that SUBCONTRACTOR has any

CAPIS I.D. LM001SCHO
Schomburg Center for Research in Black Culture
CONTRACT # 1-General Construction
February 2005

power, to bind CONTRACTOR or to assume or to create any obligation, expressed or implied, on behalf of CONTRACTOR, CONTRACTOR and/or A/E.

13.7    Any failure by CONTRACTOR at any time, or from time to time, to enforce any of the terms or conditions of this Agreement shall not constitute a waiver of such terms or conditions and shall not affect or impair such terms or conditions in any way, or the right of CONTRACTOR at any time to avail himself of such remedies as it may have for any breach or breaches of such terms or conditions by SUBCONTRACTOR. The right and remedies of CONTRACTOR hereunder shall be cumulative and in addition to any other rights available under applicable law or equity.

IN WITNESS WHEREOF, CONTRACTOR and SUBCONTRACTOR have signed this Agreement in triplicate as of the day and year above written. One counterpart each has been delivered to CONTRACTOR, SUBCONTRACTOR and CITY. All portions of the Contract Documents have been signed, initialed or identified by CONTRACTOR and SUBCONTRACTOR or identified by A/E on their behalf.

**CONTRACTOR**

By _____

Name _D. CLARKE PILE_

Title _SR. VICE PRESIDENT_

Witness: _William F. Klaus_
_ANTHONY PATANDI, CONTROLLER_

**SUBCONTRACTOR**

By _Eftis Koug_____

Name _Eleftherios Kougentakis_

Title _Secretary_

(seal)
ATTEST: _____
_ANTHONY PATANDI, CONTROLLER_

License No. _N/A_

Fed. Tax ID No _83 0384633_

ACKNOWLEDGMENT OF SUBCONTRACTOR, IF A CORPORATION

STATE OF NEW YORK)
CITY OF NEW YORK) ss:
COUNTY OF _KINGS_

On the _4th_ day of _MAY_ in the year 20_05_, before me personally came _ELEFTHERIOS KOUGENTAKIS_ to me known, who, being by me duly sworn, did depose and say that he resides at _3808 FILLMORE AVE BRKLYN_ that he is the _SECRETARY_ of _BEYS GEN'L CONST'N CORP_ the corporation described in and which executed the above instrument and that he signed his name in behalf of the Board of Directors of said corporation.

AGREEMENT
IV. - 10

_Joanna Katsimbrakis_

JOANNA KATSIMBRAKIS
Notary Public, State of New York
No. 01KA5069243
Qualified in Richmond County
Commission Expires Nov. 25, 2006

CAPIS I.D. LM001SCHO
Schomburg Center for Research in Black Culture
CONTRACT # 1-General Construction
February 2005

_____
NOTARY PUBLIC OR COMMISSIONER OF DEEDS

ACKNOWLEDGEMENT OF SUBCONTRACTOR, IF A PARTNERSHIP

STATE OF NEW YORK)
CITY OF NEW YORK) ss:
COUNTY OF

On the _____ day of_____ in the year 20_____ before me personally came _____ to me known and known to me to be a member of the firm _____ described in and who executed the foregoing instrument; and he duly acknowledged to me that he executed the same for and in behalf of said firm for the uses and purpose mentioned therein.

_____
NOTARY PUBLIC OR COMMISSIONER OF DEEDS

ACKNOWLEDGEMENT OF SUBCONTRACTOR, IF AN INDIVIDUAL

STATE OF NEW YORK)
CITY OF NEW YORK) ss:
COUNTY OF

On the _____ day of _____ in the year 20_____, before me personally came _____ to me known and to me to be the person described in and who executed the foregoing instrument and he duly acknowledged that he executed the same.

_____
NOTARY PUBLIC OR COMMISSIONER OF DEEDS

AGREEMENT
IV. - 11

CAPIS I.D. LM001SCHO
Schomburg Center for Research in Black Culture
CONTRACT # 1-General Construction
February 2005

## INSURANCE EXHIBIT TO AGREEMENT BETWEEN CONTRACTOR AND SUBCONTRACTOR

**Environmental Insurance:**

If required in the Contract Documents, by the CONTRACTOR, or if the work of this Agreement involves abatement of, or contact with  any hazardous materials, the SUBCONTRACTOR shall evidence by means of a policy endorsement (ISO Form CG 2010) signed by a company representative with binding authority that the SUBCONTRACTOR's CGL Policy includes coverages for claims arising out of asbestos, lead-based paint, or other hazardous materials encountered in the course of the SUBCONTRACTOR rendering project-related activities.

The SUBCONTRACTOR that will perform asbestos abatement (inclusive of air monitoring) or lead abatement shall procure and maintain the following coverages either through endorsement to its CGL Policy or a separate Contractor's Pollution or Environmental Impairment Liability policy with limits of  $5,000,000 per occurrence and in the aggregate, combined single limit for bodily injury and property damage; $5,000,000 each occurrence and aggregate for products and completed operations; $5,000,000 general aggregate. This insurance policy must be maintained throughout the term of the Agreement and shall protect the CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, CITY, the SUBCONTRACTOR and its subcontractors performing work at the site or sites from claims for property damage and/or bodily injury, including accidental death, which may arise from operations under the Agreement, whether such operations are performed by the SUBCONTRACTOR or anyone directly or indirectly employed by it.   The coverage provided must be "occurrence" based; "claims made" coverage will not be accepted.  This coverage shall not contain a sunset provision, commutation clause or any other provision which would prohibit the reporting of a claim and the subsequent defense and indemnity that would normally be provided by the policy. The limits and coverage requirements may be revised at the option of the CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG  CENTER,  and/or  CITY.     Such  policy  shall  be  in  the SUBCONTRACTOR's name and include the CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY as additional insureds as their interests may appear thereunder and endorsed to cover liability assumed by the SUBCONTRACTOR under the indemnity provisions of the Agreement.  The policy of insurance shall also contain or be endorsed to include the following:

a)     Coverage for asbestos abatement (inclusive of air monitoring) or lead abatement operations, as applicable and as described by the Agreement;

b)     Environmental coverage as respects to asbestos and lead abatement, as applicable, for all phases of abatement process;

c)     Transportation coverage for the hauling of asbestos or lead containing material, as applicable, from the project site to the final disposal location;

d)     Premises/operations liability;

e)     Broad form property damage;

f)     Products and completed operations coverage for a minimum of 5 years after project completion;

AGREEMENT
IV. - 12

CAPIS I.D. LM001SCHO
Schomburg Center for Research in Black Culture
CONTRACT # 1-General Construction
February 2005

g)   Contractual liability in accordance with ISO policy form CG 00 01 85;

h)   Cross liability/severability of interest;

i)   CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY and their respective officers, employees, representatives, officials and agents are to be covered as additional insureds as respects: liability arising out of activities performed by or on behalf of the SUBCONTRACTOR; premises owned, occupied or used by the SUBCONTRACTOR; or automobiles owned, hired, leased, or borrowed by the SUBCONTRACTOR. The coverage shall contain no special limitations on the scope of protection afforded to the CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY and their respective officers, employees, representatives, officials and agents;

j)   CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY shall be provided with a waiver of subrogation;

k)   Unless otherwise agreed, limits of liability shall apply only to the Agreement. Limits afforded by the policy cannot be shared or impaired by other operations of the SUBCONTRACTOR;

l)   The policy shall not exclude asbestos or lead bodily injury to employees of the CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, CITY, SUBCONTRACTOR, lessee, real estate manager and subcontractors, so long as their designated job duties do not require them to be in the regulated abatement area;

m)   If the policy or any endorsement contains a provision which limits or eliminates bodily injury or property damage coverage based on final air fiber clearance levels, the policy shall be modified so that it is consistent with the clearance level (F/CC) and the appropriate analytical protocol contained in the project specifications;

n)   Personal injury;

o)   Independent contractors;

p)   No XCU (explosion, collapse, underground) exclusion;

q)   For any claims related to this project, the SUBCONTRACTOR's insurance shall be primary insurance as respects CONTRACTOR, NEW YORK PUBLIC LIBRARY, and CITY, and their respective officers, employees, representatives, and agents. Any insurance or self-insurance maintained by CONTRACTOR, NEW YORK PUBLIC LIBRARY, SCHOMBURG CENTER, and CITY shall be excess of the SUBCONTRACTOR's insurance and shall not contribute with it;

r)   The policy shall contain an endorsement that provides for third party action over coverage;

s)   The policy shall provide that coverage shall be afforded in all cases except for the SUBCONTRACTOR's willful or intentional non-compliance with applicable government regulations;

t)   In the event of a material change in coverage or notice of cancellation or non-renewal, CONTRACTOR shall be provided with a minimum of sixty (60) days prior written notice by Certified Mail, Return Receipt Requested;

CAPIS I.D. LM001SCHO
Schomburg Center for Research in Black Culture
CONTRACT # 1-General Construction
February 2005

The SUBCONTRACTOR shall furnish CONTRACTOR with certified copies of endorsements effecting coverage by this clause prior to work commencing. The SUBCONTRACTOR shall include all subcontractors as insureds under its policy or it shall furnish separate certificates and endorsements for each subcontractor. Insurers must have a minimum rating of an A-VI in the most current A.M. Best Rating Guide, unless otherwise approved by CONTRACTOR. SUBCONTRACTOR must receive specific written approval from CONTRACTOR prior to proceeding. Prior written approval from CONTRACTOR shall be necessary for self-funded, policy fronting or other non-risk transfer insurance mechanisms. If SUBCONTRACTOR has such a program, full disclosure must be made to CONTRACTOR prior to any consideration being given.

**Professional Liability Insurance:**

If required by the Contract Documents, by the CONTRACTOR, or if this Agreement is to provide "Professional Services", the SUBCONTRACTOR shall provide Professional Liability Insurance in amounts not less than $1,000,000 insuring the SUBCONTRACTOR for professional errors and/or omissions in the performance of work under its Agreement with the CONTRACTOR. The SUBCONTRACTOR represents and warrants to the CONTRACTOR that the SUBCONTRACTOR's Professional Liability Insurance policy shall cover liability assumed by the SUBCONTRACTOR under the indemnity provisions of the Agreement (unless otherwise covered under the Commercial General Liability Insurance policy), and be primary, non-contributory and provide for severability of interests.

# BEYS GENERAL CONSTRUCTION CORP.
## 2520 CONEY ISLAND AVENUE
## BROOKLYN, NY 11223
### Phone 718 627 7780 Fax 718 336 5960

September 26, 2005

By Facsimile
James Grundhoffer, PE
Hill International, Inc.
One Penn Plaza
Suite 3415
New York, N.Y. 10119

Re:    Schomburg Center
       Contract No. 20040018658

Dear Mr. Grundhoffer:

We are in receipt of your September 23, 2005 letter and offer the following response.

As you are aware, the bid package issued for this project contained very detailed specifications for the fabrication and installation of the curtain wall. In particular, it was required that the product come from a manufacturer who can provide "evidence of manufacturing experience in design, fabrication, erection of stainless steel assemblies" and who has been "regularly engaged in such design, fabrications and erection for a period of not less than 10 years". The specifications go on in Section 08930, 2.1 to identify Steelite Systems as the preferred vendor for the curtain wall system.

Prior to the bid, Beys contacted every fabricator in the U.S. and Canada listed in the Blue Book, Sweet's Catalogue and on the Internet. Based on responses received from those inquiries, we sent out the drawings and specifications to 54 curtain wall manufacturers. After project award, we learned that Steelite was shutting down its operations and thus, was no longer able to fabricate the curtain wall. Of the 54 companies to whom packages were sent, the only other to express interest and have its own manufacturing operation was UAD. Although UAD expressed interest in doing the job utilizing a curtain wall system, which deviated slightly from the specifications, Beys believed that they were the best viable alternative because of their extensive experience and local fabrication plant. As a result, we submitted UAD as an "or equal" manufacturer as permitted under the terms of the contract. By letter dated July 11, 2005, UAD's design was approved as an "or equal." After two months of discussions with the architect about the UAD plan, we were notified by letter dated

James Grundhoffer, P.E.
September 26, 2005
Page 2

September 19, 2005 that the approval of UAD as a proposed "or equal" subcontractor had been rescinded.

On that same day, the architect referred us to a company called D&D Architectural Products as a potential replacement for UAD. In the past week, Beys has learned that D&D is operated by a former employee of Steelite, has only been in business for four months and has no manufacturing capability whatsoever. When we spoke to D&D they advised us that we would have to deal with their authorized distributor, a local installer named Industrial Windows. While it appears that Industrial Windows has been in business as an installer for more than 10 years, Industrial has no manufacturing capability and apparently intends to subcontract this work back to D&D. Based on the fact that Industrial did not meet the contract requirements for experience, we requested a payment and performance bond. Although Industrial Windows was initially willing to provide the bonds, it reneged on that promise late last week citing D&D's lack of experience as the reason. At the same time, Industrial demanded $300,000 up front before performing any work. Compounding matters further, D&D advised us that it intends to subcontract out the fabrication to another company who will make the product in Taiwan. Beys has no information respecting the qualifications of this fabricator.

When we bid this project, we had a contractual right to expect that companies with ten or more years of experience would be available to fabricate what is essentially a custom product. Unable to find a company with the requisite experience, we attempted instead to obtain financial security in the form of payment/performance bonds. This was similarly unavailable. Your September 23 letter is little more than an attempt to force a proprietary specification on us using subcontractors who do not meet the project requirements. We point out, however, that the use of proprietary specifications to effectively preclude competition and ensure the award of a contract to a particular manufacturer are illegal and unenforceable.

The fact is that despite Beys' extensive efforts to find qualified companies to perform the design as set forth in the contract specifications, the proprietary nature of the specifications has made this impossible. You have been made aware of our efforts throughout the process and neither Hill nor the architects have offered any other companies who might meet the project requirements. Rather than threatening Beys with removal of this work from its contract, we suggest that a meeting be scheduled immediately to discuss possible design alternatives so as to minimize any potential delays to the project caused by this proprietary specification.

James Grundhoffer, P.E.
September 26, 2005
Page 3

Very truly yours,

*Eleftherios Koug* [signature]

Eleftherios Kougentakis
Secretary

cc:    J. Pestka, A. Asher – NYPL
       K. Yim, M. Minuto, A. Mayer, M. Siriban – DDC
       J. Milano, A. Frazier, W. Hooper – IHII



# *Industrial Window Corp.*

515 North State Road
Briarcliff Manor, NY 10510
(914) 923-1800 • (914) 923-6028
*email: info@industrialwindow.com*

www.industrialwindow.com

October 7, 2005

TO:  Gus Lambraks

FROM: Raymond Beninato

RE:  Schomburg Center

The following must be inserted in our Contract for the above referenced Project.

Insert within Sections 3.2 D and 17.1 the following sentence: "Liquidated damages under the contract between Beys General Construction Corp, as Contractor, and Industrial Window Corp., as Subcontractor, shall not exceed $ 900.00 per day with a maximum amount of liquidated damages not to exceed $ 10,000.00 under the contract."

Insert within Section 13.1E the following: "Beys General Construction Corp. will notify Industrial Window Corp. and RLI Insurance Company via certified registered mail that Beys General Construction Corp is considering declaring a contractor default and has requested and attempted to arrange a conference with both Industrial Window Corp. and RLI Insurance Company to be held not later that 15 days after receipt of such notice to discuss methods of performing the construction contract.  Should Beys General Construction Corp., the Contractor, Industrial Window Corp. the Subcontractor, and RLI Insurance Company, the Surety, not agree on methods of curing the default, then Beys General Construction Corp. shall declare a default notice of Industrial Window Corp. and formally terminate Industrial Window Corp.'s right to complete the contract. Such Subcontractor default shall not be declared earlier than 20 days after Industrial Window Corp. and RLI Insurance Company have received the earlier 15 days pre-default notice via certified registered mail."

In addition, I have attached Pages 11, 18, 19, 22, & 24.  The noted changes must be made to these pages also.

Please feel free to call to discuss.

requirements of Contract Documents. If notwithstanding the provisions of subsection (e) above, changes in other parts of the Work or the work of other contractors are required by its substitutions, Subcontractor shall be responsible for the costs of any such changes.

(h) Time being of the essence, the Contract Time shall not be extended by any circumstance resulting from a proposed substitution, nor shall Subcontractor be entitled to any compensation for any delay caused thereby or related thereto.

## 2.7   Quality and Labelling

All materials furnished shall be new unless stated otherwise. When materials are specified to conform to any standard, the materials delivered to the Site shall bear manufacturer's labels stating that the materials meet such standards. The above requirements shall not restrict or affect Contractor's right to test materials as provided in the Contract.

## ARTICLE 3
## TIME OF PERFORMANCE, PROGRESS SCHEDULE, COORDINATION, TIME EXTENSION

## 3.1   Contract Time

Time is absolutely of the essence in this performance of this Contract. Subcontractor must comply with a specific schedule determined and provided by the Contractor and submit shop drawings and other submittals required under this Subcontractor Scope of Work for approval within six weeks from receipt of this agreement. Fabrication and Delivery to Construction site is to be twelve weeks following approval of Submittals. Completion of installation is to be six weeks following commencement of material delivery. Subcontractor shall have the responsibility to coordinate all work, layouts, coordination with other subcontractors, public agencies, delivery dates and time with the Contractor's Project Superintendent. *AS PER LETTER FROM DMJ ARCHITECTURE DATED ____*

## 3.2   Progress Schedule

(a)    The Subcontractor shall establish a progress schedule in the form of a bar chart or a critical path method (CPM) for approval by Contractor. The progress schedule shall be followed by the Subcontractor as it shall be updated from time to time, and shall be used by the Contractor to evaluate the progress of the Subcontractor's Work.

(b)    Subcontractor shall commence the Work upon receipt of a written notice to proceed signed by Contractor and shall thereafter prosecute the Work to be performed hereunder diligently, without interruption, and in accordance with the time and place requirements of the Project as determined and directed by Contractor, by using such means and methods of construction as will assure that the Work will be performed in accordance with the Contract Documents and to the satisfaction of the City of New York, as Tenant, Owner and Contractor.

(c)    If the Subcontractor falls behind the progress schedule then in effect, Subcontractor shall take whatever steps may be necessary to improve its progress and shall, if requested by Contractor, submit operational plans to demonstrate the manner in which the lost time may be regained. It is the responsibility of Subcontractor to maintain its schedule so as not to delay the progress of the Project or the work of other contractors, time being of the essence. If Subcontractor delays the progress of its Work or the work of other men, the number of shifts, the days of work

BEYS GENERAL CONSTRUCTION CORP.                    INITIAL HERE    ____  ____

                                                                        BEYS   SUBC

(2)    to protect Contractor from loss due to defective Work or to reimburse Contractor for fines on account of noncompliance with applicable laws, rules and regulations, including OSHA;

(3)    to protect Contractor and Tenant from loss due to death or injury to person or damage to the Work or damage to the property or work of Contractor, other contractors or others to the extent of Subcontractor's fault; if not covered by Subcontractor's insurance.

(4)    in the event that there is reasonable evidence that the Work will not be completed;

(5)    in the event that there is reasonable evidence that the work will not be completed within the time provided; or

(6)    in the event that Subcontractor persistently fails to perform the Work in accordance with the Contract Documents.

In any of such events, Contractor shall have the right to apply any such amounts so withheld in such manner as Contractor may deem proper to satisfy such claims, to secure such protection, complete the Work or to compensate Contractor for any loss suffered by reason of Subcontractor's delay. Such application shall be deemed payment for the account of Subcontractor.

(b)    The provisions of this Section 5.11 are solely for the benefit of Contractor, and any action or non-action by Contractor shall not give rise to any liability on the part of Contractor.

## ARTICLE 6
## SUBCONTRACTOR

### 6.1    Superintendence by Subcontractor

Subcontractor shall employ a full-time competent Construction Superintendent and Project Manager in charge of the Work approved by Contractor. The Construction Superintendent shall devote full time to the Work, shall be present at the Site during the time the Work is required to be performed and shall have full authority to accept instructions, make decisions and act for the Subcontractor at all times. Any communication to or from the Superintendent or Project Manager in charge of the Work shall be as binding as if given to or received from the Subcontractor itself.

WORKING SUPER ONLY - ROB.

### 6.2    Representations and Warranties

Subcontractor represents and warrants that:

(a)    Subcontractor is financially solvent and is experienced in, and competent to perform, the Work;

(c)    Subcontractor is familiar with all Federal, State, City or other laws, ordinances, orders, rules and regulations related to the Work;

(d)    Any temporary and permanent Work required by this Agreement can be satisfactorily constructed, and that such construction will not injure any person or damage any property; and

(d)    Subcontractor has carefully examined the Contract Documents and the Site and, from Subcontractor's own investigations, is satisfied as to the location of the Work, the character, quality and quantity of surface and other facilities needed for the performance of the Work, the general and local conditions, and all other conditions or items which may affect the Work.

### 6.3    Verifying Dimensions and Site Conditions

Before proceeding with the Work, Subcontractor will accurately check all previous and surrounding work and determine the correctness of the same; failure on its part to detect or report discrepancies will relieve Contractor of liability from any and all claims to recover cost,

BEYS GENERAL CONSTRUCTION CORP.

18

INITIAL HERE ___

_____    _____
BEYS    SUBC

expense, loss or damage resulting therefrom. Subcontractor shall take, determine, investigate and verify all field measurements, dimensions, field construction criteria, Site and information contained in the Contract Documents.

Subcontractor shall be responsible for determining the exact location of and to verify the spatial relationships of all Work. Consistent with Section 2.3 and before proceeding with the Work, if any conflicts are found in the Contract Documents or if Subcontractor has any questions concerning the foregoing, it shall immediately notify Contractor and shall thereafter perform the Work in accordance with the directions of Contractor. *Benchmarks excluded* RJB. *& survey.*

### 6.4  Meetings
Subcontractor shall attend all meetings attended by a responsible official, as directed by Contractor, and shall be represented at such meetings by a person having knowledge of the Work and authorized to act for Subcontractor at all times.

### 6.5  Related Work
Subcontractor shall examine the Contract Documents for related work to ascertain the relationship of such work to the Work under the Contract Documents.

### 6.6  ~~Survey and Layout~~
~~Subcontractor shall furnish benchmarks and monuments of the property necessary for the Work. Subcontractor shall lay-out the Work.~~    *RJB*

### ARTICLE 7
### INSPECTION AND ACCEPTANCE

### 7.1  Access to the Work
Owner, Engineer, Contractor or their authorized representatives shall at all times have access to and the right to observe the Work and all facilities where the Work or any part thereof is being fabricated or stored, and Subcontractor shall provide proper facilities for such access and observation.

### 7.2  Required Inspection and Test
If the Contract Documents, or any laws, rules, ordinances or regulations, require that any Work be inspected or tested, Subcontractor shall give Contractor timely notice of readiness, not less than three [3] business days, that the Work is fully completed and ready for inspection or testing and the date fixed for such inspection or testing. Neither the Contractor, nor  shall be obligated or bound to inspect the work of the Subcontractor on the day designated by the Subcontractor for any inspection or testing. The Subcontractor shall coordinate and pay for inspection and testing.

### 7.3  Correction of Work
Any Work not approved by Contractor or Owner shall immediately be reconstructed,

BEYS GENERAL CONSTRUCTION CORP.              INITIAL HERE

19

                                                        BEYS    SUBC

~~Asbestos Abatement Contractors Liability with a limit of $2,000,000 per occurrence and aggregate.~~

## 12.2 Effect of Procurement of Insurance

Neither the procurement nor the maintenance of any type of insurance by Subcontractor, Owner, Contractor or Tenant shall in any way be construed or be deemed to limit, discharge, waive or release Subcontractor from any of the obligations and risks impressed upon Subcontractor by this Agreement or to be a limitation on the nature or extent of such obligations and risks.

## ARTICLE 13
## TERMINATION

### 13.1 Termination for Cause

(a)     If any of the following events shall occur (an "Event of Default"):

(i)     Subcontractor shall violate any substantial provision of this Agreement; or

(ii)     any material adverse change shall take place in the financial condition of the Subcontractor; or

(iii)     any action shall be taken by Subcontractor which would result in Subcontractor becoming the subject of any insolvency or bankruptcy proceeding, then the Contractor and  may serve written notice upon Subcontractor terminating or partially terminating this Agreement at a specified date. The notice shall contain the reasons for termination and shall not be effective to terminate this Agreement if Subcontractor cures all Events of Default stated in the notice prior to the date specified in the notice of termination. The term "insolvency proceeding" as used herein shall include the consent, acquiescence or taking of any action by Subcontractor, or the filing by or against Subcontractor of any petition or action, looking to or seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any other present or future

(iv)     City, State and  federal laws or regulations; or the appointment, with or without the consent of Subcontractor, of any trustee, custodian, receiver or liquidator of Subcontractor or any property or assets of Subcontractor; or if Subcontractor shall make an assignment for the benefit of creditors or shall be unable to pay its debts as they become due.

(v)     In the event the Subcontractor files a petition in bankruptcy or insolvency, or otherwise becomes disable from complying with the provisions herein as to character or time of performance including but not limited to payment for all materials furnished and work and labor performed under this subcontract, or conveys a majority of its shares of stock to new shareholders not set forth in the next subparagraph, or elects a new majority on its Board of Directors not identified in the subparagraph below, or elects new officers, not identified in the subparagraph (vi) below, or elects new officers, not identified in the subparagraph (vi) below and this event is not corrected within five (5) days after written request by the Contractor to the Subcontractor.

(vi)     The Subcontractor agrees to maintain the following persons as stockholders:

_____     ,     _____

Directors _____     ,     _____

_____     ,     _____

BEYS GENERAL CONSTRUCTION CORP.          INITIAL HERE

22

_____     _____
BEYS     SUBC

6.    Complete performance of such part of the Work as shall not have been terminated by the notice of termination.

(d)    In the event of a termination of this Agreement pursuant to this Section 13.2. Subcontractor shall be paid by Contractor, only the apportioned costs incurred by Subcontractor and arising out of said termination.

### 13.3 Suspension of Work

Contractor and may at any time and for any reason direct Subcontractor to suspend, stop or interrupt the Work or any part thereof. Such direction shall be in writing and shall specify the period during which the Work is to be stopped. Subcontractor shall resume the Work upon the date specified in such direction or upon such other date as Contractor may thereafter specify in writing. The period during which the Work shall have been suspended, stopped or interrupted may, if warranted, be added to the time fixed for performance. A suspension, stoppage or interruption of the Work pursuant to this provision shall not give rise to any claim against Contractor for additional compensation.

### ARTICLE 14
### PROTECTION OF RIGHTS, PERSONS AND PROPERTY

### 14.1 Accident Prevention

Subcontractor shall at all times take every precaution against injuries to persons or damage to property and for the safety of persons engaged in the performance of the Work, and shall comply with Safety Plans pertinent to the Project site, and all City, Federal Safety and OSHA requirements, rules and regulations and as stipulated in the Contract Documents.

### 14.2 Safety Programs

Subcontractor shall be responsible for the initiation, maintenance and supervision of safety precautions and programs in connection with the Work and shall integrate his safety program with the Contractor and all other subcontractors working on or located at the project site.

### 14.3 Safety Plan

Subcontractor shall furnish for acceptance by the Contractor's representative not later than 10 days after date of Notice to Proceed, the Subcontractor's Safety Plan for his work.

Acceptance of the Subcontractor's plan is required prior to the start of construction and will be predicated on satisfactory performance during the construction. The Contractor reserves the right to require the Subcontractor to make changes in the Safety Plan as necessary.

### 14.4 Material Safety Data Sheets

Subcontractor shall provide Contractor's site representative copies of Material Safety Data Sheets ("MSDS"), in accordance with OSHA requirements for all materials utilized for and/or stored at the site prior to said materials being delivered to site.

### 14.5 Protection of Work and Property

(a)    Subcontractor shall at all times guard Owner's, Contractor's and the City's property from injury or loss in connection with the Work. Subcontractor shall at all times guard and PROTECT WITHIN reason

BEYS GENERAL CONSTRUCTION CORP.              INITIAL HERE

24                    BEYS    SUBC