UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
INDUSTRIAL WINDOW CORP.,            :
                                    :
            Plaintiff,              :       07 Civ. 10959 (JSR)
                                    :
            -v-                     :       OPINION AND ORDER
                                    :
FEDERAL INSURANCE COMPANY,          :
                                    :
            Defendant.              :
------------------------------------ x
FEDERAL INSURANCE COMPANY,          :
                                    :
            Third-Party Plaintiff,  :
                                    :
            -v-                     :
                                    :
BEYS GENERAL CONSTRUCTION CORP.,    :
                                    :
            Third-Party Defendant.  :
------------------------------------ x
BEYS GENERAL CONSTRUCTION CORP.,    :
                                    :
            Fourth-Party Plaintiff, :
                                    :
            -v-                     :
                                    :
HILL INTERNATIONAL, INC.,           :
                                    :
            Fourth-Party Defendant. :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        The instant action arises from a dispute over the scope of

work included in a series of contracts for the construction of the

Schomburg Center for Research in Black Culture ("the Center"), a

national research facility in Harlem devoted to documenting the

global African and African diasporan experience.  On December 3,

2007, one of the contractors, plaintiff Industrial Window Corp.

("IWC") filed suit seeking recovery for extra-contractual work under

a payment bond made by defendant Federal Insurance Company

("Federal") as surety and third-party defendant Beys General
Construction Corp. ("Beys") as principal.  On May 6, 2008, the Court
denied Federal's pre-discovery motion for summary judgment, holding
that IWC's action was not barred by the Alternative Dispute
Resolution ("ADR") provisions contained in the prime contract,
because those provisions were not clearly and unequivocally
incorporated by reference into the contract between IWC and Beys.  On
June 10, 2008, upon notice of the Court's decision, Federal filed a
Third-Party Complaint against Beys, and on June 11, 2008, Beys filed
a Fourth-Party Complaint against Hill International, Inc. ("Hill"), a
party to the prime contract.

Hill now moves, pursuant to Fed. R. Civ. P. 56, for summary
judgment dismissing Beys' Fourth-Party Complaint as barred by the ADR
provisions set forth in the prime contract, and Federal, Beys, and
Hill each move for summary judgment dismissing certain claims
relating to certain of IWC's pending "change orders."[1]

The relevant facts, either undisputed or, where disputed,
taken most favorably to the non-moving parties, are as follows.

On February 11, 2004, Hill entered into a contract with the
City of New York Department of Design and Construction ("DDC") to

---

[1] During oral argument, the Court granted Federal's and
Beys' motion for summary judgment as to IWC's claim for work
relating to "concealed steel beams," because IWC failed to offer
any evidence in support of that claim.  See transcript, 12/30/08.
Thus, because any claim asserted against Hill as to "concealed
steel beams" has been rendered moot, Beys' Fourth-Party Complaint
against Hill is hereby dismissed in that respect as well.

manage the Center's construction.  <u>See</u> Federal and Beys Rule 56.1
Statement ("Fed. 56.1") ¶ 1; Rule 56.1 Statement in Opposition to
Federal's and Beys' Motion for Partial Judgment ("IWC 56.1") ¶ 1;
Fourth-Party Defendant's Rule 56.1 Statement of Facts ("Hill 56.1")
¶¶ 11-12; Rule 56.1 Counter Statement of Facts by Federal and Beys
("Fed. Counter 56.1") ¶¶ 11-12.  Hill, in turn, entered into a
contract with Beys to act as general contractor of the project ("the
Hill/Beys contract").  Fed. 56.1 ¶¶ 2-3; IWC 56.1 ¶¶ 2-3; Hill 56.1 ¶
13.  Beys posted a payment bond from Federal, which stated in part
that a copy of the Hill/Beys contract was "annexed to and hereby made
a part of this bond as though herein set forth in full."  Affidavit
of Anthony Hamilakis in Support of Motion for Partial Summary
Judgment by Federal and Beys ("Hamilakis Aff.") Ex. B.

On September 27, 2005, Beys entered into a subcontract with
IWC to install a curtain wall system at the Center ("the IWC
subcontract" or "subcontract").  Hamilakis Aff. Ex. C.  Article 1 of
the IWC subcontract defined the contract to include the subcontract
itself, certain enumerated specifications and drawings, and the prime
contract between DDC and Hill.  <u>Id.</u> Art. 1.1.1.  Although IWC did not
read the prime contract between DDC and Hill before executing the
subcontract, it nevertheless understood that the prime contract was
part of its subcontract with Beys.  Fed. 56.1 ¶¶ 22-23; IWC 56.1
¶¶ 22-23.

The prime contract between DDC and Hill provides that
whenever a contractor or subcontractor performs "Extra Work" or

"disputed Work," the contractor or subcontractor is required to provide daily contemporaneous records of such work.  Hamilakis Aff. Ex. A Art. 30.  It further provides that "[f]ailure to comply strictly with these requirements shall constitute a waiver of any claim for extra compensation or damages on account of the performance of such Work or compliance with such determination or order."  Id. Notwithstanding this provision, IWC did not provide contemporaneous records to Beys, Hill, or DDC for any of the alleged "extra work" at issue here.  Fed. 56.1 ¶ 40; IWC 56.1 ¶ 40; Hill 56.1 ¶¶ 77-78; Rule 56.1 Statement in Opposition to Hill's Motion for Summary Judgment ¶¶ 77-78.

As to proposed contract changes, the prime contract states that:

> Changes may be made to this Contract only as duly authorized by the Agency Chief Contracting Officer or his or her designee.  Contractors deviating from the requirements of an original purchase order or contract without a duly approved change order document, or written contract modification or amendment, do so at their own risk."

Hamilakis Aff. Ex. A Art. 26.1.  Similarly, Article 8.1(c) of the IWC subcontract provides that

> All change orders, and any subsequent modifications, changes, additions or deletions, must be in writing and signed by either George Kougentakis or Eleftherios Kougentakis.  This Subcontract provision may not be modified orally.  The Subcontractor understands that it is not entitled to rely upon the oral direction of any persons employed by the Contractor . . . Any work done without the written authorization of the named party shall be at the sole risk of the Subcontractor and without any further liability of the Contractor for any payment thereof.

Hamilakis Aff. Ex. C Art. 8.

Article 29 of the prime contract provides for Resolution of Disputes. <u>See</u> Hamilakis Aff. Ex. A. That provision states that

> All disputes between the City and the Contractor of the kind delineated in this article that arise under, or by virtue of, this Contract shall be finally resolved in accordance with the provisions of this article and the PPB rules. The procedure for resolving all disputes of the kind delineated herein shall be the exclusive means of resolving any such disputes.

<u>Id.</u> § 29.1. The article goes on to provide for an elaborate dispute resolution process, including the presentation of disputes to the Commissioner, <u>id.</u> § 29.4, appeal to the Comptroller, <u>id.</u> § 29.5, appeal to the Contract Dispute Resolution Board, <u>id.</u> §§ 296 and 29.7, and final appeal to a Court pursuant to Article 78 of the C.P.L.R. <u>Id.</u> § 29.7.6.

The Hill/Beys contract contains an incorporation-by-reference provision that states

> To the extent applicable to the Work to be performed by [Beys] under [the Hill/Beys contract], the provisions of the [prime contract between DDC and Hill] . . . are hereby incorporated into [the Hill/Beys contract] with the same force and effect as though set forth in full herein. [Beys] shall be bound to [Hill], to the same extent that [Hill] is bound to [DDC], by all of the terms and provisions of the [prime contract], and by all decisions, rulings, and interpretations of [DDC] or its authorized representative. A copy of the [prime contract] is attached hereto.

Transmittal Affidavit of Ronald B. Feingold, Esq. in Support of Fourth-Party Defendant's Motion for Summary Judgment ("Feingold Aff.") Ex. J, Art. 9.

The IWC subcontract, in turn, contains an integration clause, which provides that "[t]his Agreement is complete in and of itself and any and all prior agreements, understandings, communications, whether oral or written, are deemed merged herein and superseded hereby and

consist of 33 pages in this Agreement and attached Exhibits."
Hamilakis Aff. Ex. C Art 21.7.  The subcontract further provides that
"[IWC] shall be solely responsible for all construction means,
methods, techniques and procedures within the scope of [IWC's] Work,"
id. Ex. C Art. 2.5(a), and deems IWC "responsible for the provision of
all necessary 'Permits,'" as well as for "all payments and the
settlement of all subsequent violations and all legal fees incurred in
the process." Id. Ex. C Art. 2.1.  IWC is further required to "give
all notices and comply with all laws, ordinances, rules, regulations
and lawful orders of any public authority bearing on the performance
of the Work." Id. Art. 2.f(f).

    In a similar vein, the prime contract (which was deemed part
of the IWC subcontract) provides that

> Contractor to be responsible for notifying the MTA/NYCT prior
> to start of construction regarding the proximity of the area
> under construction to the 135th Street subway station.
> Contractor to be responsible for obtaining any approvals,
> permits and sign offs required by the MTA/NYCT and adhering to
> any rules and regulations established by the MTA/NYCT regarding
> construction work adjacent to the subway station.

Id. Ex. A, Section 01010, Art. 1.2.  The prime contract also provides
that "[i]n order to perform the specified scope of work without any
disruption to the MTA infrastructure or obstruction to the subway
access in the vicinity of the Schomburg Center," the bidder must
"[s]ubmit a comprehensive and site specific means and method for the
curtain wall installation." Id. Ex. A, Attachment D - Special
Requirements.

    During the course of IWC's work on the project, certain
disputes arose over the scope of the IWC subcontract.  Based on these

disputes, IWC seeks to recover the value of certain "pending change orders" for work and/or materials that it contends are beyond the scope of the subcontract, see Feingold Aff. Ex. X at 4.

First, IWC asserts a claim for stainless steel convector covers, which it argues were not intended to be covered by the IWC subcontract. Fed. 56.1 ¶ 25; IWC 56.1 ¶ 25. The scope of IWC's work is delineated, in part, by Article 2.1 of the IWC subcontract, which provides that "Contract Work shall include, but not be limited to all Labor, all Materials and all Equipment necessary for Subcontractor to supply, deliver and install the work as shown and described more fully set forth in the Scope of Work in the Drawings and Specifications." Hamilakis Aff. Ex. C, Art. 2.1. Under the heading "SCOPE OF WORK," the subcontract provides that the "subcontractor will perform all work necessary to furnish and complete stainless steel assemblies as specified in Section 08930." Id. Section 08930, in turn, provides that work relating to "stainless steel assemblies" includes "all labor, materials, equipment, and services" necessary to complete, inter alia, "[s]tainless steel convector enclosures." Id. Ex. D. Similarly, the IWC subcontract lists Drawing A-313 (which shows and describes an "SS Custom Convector Cover" at detail C3) as one of the drawings governing IWC's work. Id. Ex. C at 6, Ex. E at C3. Stainless steel convector covers are not included among the twelve exclusions or qualifications listed under the "Scope of Work" section. Id. Ex. C at 6.

Michael Vicario and Raymond Beninato, IWC's president and vice-president, respectively, conceded at their depositions that

stainless steel convector covers were required under the terms of the IWC subcontract.  See Affirmation of Joseph J. Cooke in Support of Motion for Partial Summary Judgment ("Cooke Aff.") Ex. A at 24-27, 30-33; Ex. B at 55-61, 66-67.  Beninato nevertheless contends that he had a conversation with Paul Rivera, Beys' project manager, in which the parties agreed that the covers were not included within the scope of IWC's work.  Affidavit of Raymond Beninato in Opposition to Motions for Summary Judgment ("Beninato Aff.") ¶ 13.  Beninato further testified that the covers were excluded from IWC's original proposal, but were later added to the subcontract without IWC's noticing the change.  Cook Aff. Ex. B at 30-31.  In an e-mail dated January 25, 2006, Beys rejected IWC's claim for convector covers, noting that they were within the scope of the subcontract.  Hamilakis Aff. Ex. F.

Second, IWC asserts a claim for a change in the gauge of steel used for the stainless steel convector covers.  Cooke Aff. Ex. D Interr. Ans. No. 3.  When IWC estimated the cost for the stainless steel convector covers, it based its price on 22 gauge steel, but had to modify its price after the architect determined that 16 gauge steel was appropriate.  Beninato Aff. Ex. E.  This gauge was set forth in shop drawings approved by the architect.  Hamilakis Aff. ¶ 23.

Third, IWC asserts a claim for costs incurred to provide bird screens, i.e., metal covers that are used to prevent birds from nesting on the stainless steel assemblies.  Cook Aff. Ex. D Interr. Ans. No. 3; Hamilakis Aff. ¶ 26.  Drawing A-321 ("Stainless Steel Curtain Wall Mullion Details") depicts the bird screens, refers to "continuous stainless steel snap on 'bird guard' trim with 3/4 drip

edge," Hamilakis Aff. Ex. G at Detail A2 and A4, and is among the drawings identified in the IWC subcontract as forming part of IWC's work.  Id. Ex. C Art. 2.1B.  Bird screens are not included among the twelve exclusions or qualifications listed under the "Scope of Work" section.  Id. Ex. C at 6.  Beninato conceded at his deposition that bird screens were required under the terms of the IWC subcontract, Cooke Aff. Ex. B at 31-33, but contends, once again, that he had a conversation with Rivera in which the parties agreed that the screens were not within the scope of IWC's work.  Beninato Aff. ¶ 13.  As with the stainless steel convector covers, Beninato testified that the screens were excluded from IWC's original proposal, but were later added to the subcontract without IWC noticing.  Cook Aff. Ex. B at 32-33.  In an e-mail dated January 25, 2006, Beys rejected IWC's claim for bird screens, noting that they were within the scope of the subcontract.  Hamilakis Aff. Ex. F.

Fourth, IWC asserts a claim relating to the logistics of unloading and installing the curtain wall ("the curtain wall change order").  Specifically, when IWC submitted its bid and entered into the subcontract, it planned to have component parts delivered to the project cite by an 18-wheeler truck, loaded onto the sidewalk along Lenox Avenue, and erected using a Lull machine on the sidewalk.  Vicario Aff. ¶ 7 and Ex. D.  The MTA rejected IWC's unloading and installation protocol, however, because the project was located near the 135th Street IRT subway station, and the weight of the machinery and wall components exceeded the load bearing capacity of the subway structure.  Id. ¶¶ 8-9 and Ex. D.  Notably, IWC failed to examine the

work site before executing the subcontract, and thus was unaware of the existence of the subway station when it submitted its bid.  Fed. 56.1 ¶¶ 20-21; IWC 56.1 ¶¶ 20-21.  As a result, IWC resorted to an alternate, more costly method, viz., using a crane scissor lift to unload and install the curtain wall.  Vicario Aff. ¶¶ 10-11; Ex. C. After negotiations between IWC, Beys, and Hill, a claim in the amount of $110,978 was submitted by Hill to DDC to cover the cost difference for using a crane and scissor lift to conduct the work, Id. Ex. C, a claim that was signed by both Beys and Hill.  Feingold Aff. Ex. N. Hill and Beys both acknowledged that IWC was entitled to a change order relating to the delivery of the curtain wall.  Vicario Aff. ¶ 13; id. Ex. D (Hill stating that "[t]he costs have been reviewed, negotiated and deemed acceptable by Hill"); id. Ex. E (noting that IWC's claim "is essentially for unforeseen/changed conditions," and that "costs incurred by this atypical and unforeseeable method of installation are required to be paid").  On October 9, 2007, however, DDC denied IWC's request, on the ground that "the scope of work is specified under the special requirements, general conditions and summary of work that the contractor must comply with all rules and regulations, specifications and requirements, and must obtain approval of all necessary permits prior to start of construction work." Feingold Aff. Ex. O at 2.  IWC contends that it was unaware of the need to obtain MTA approval for deliveries and installation.  Cook Aff. Ex. B at 33–35.

Against this background, the Court turns to the instant motions.  Hill first argues that Beys' Fourth-Party Complaint should

10

be dismissed in its entirety because Beys has failed to pursue the dispute resolution procedures set forth in Article 29 in the prime contract between DDC and Hill.

As this Court previously observed when ruling on Federal's pre-discovery motion for summary judgment, New York courts consistently and universally uphold the validity and enforceability of contractual provisions setting forth alternative dispute resolution procedures, Westinghouse Elec. Corp. v. New York City Transit Auth., 82 N.Y.2d 47, 53 (1993), and there is no dispute here that Article 29 of the prime contract contains a "clear, explicit, and unequivocal" agreement to resolve disputes between the City and Hill, according to the procedures set forth therein. Thomas Crimmins Contr. Co. v. City of New York, 74 N.Y.2d 166, 171 (1989). The dispute here instead arises because the contract between Hill and Beys contains no direct reference to alternative dispute resolution at all. Rather, the Hill/Beys contract merely incorporates by reference the DDC/Hill contract, noting, inter alia, that Beys shall be bound to Hill "by all of the terms and provisions of the [prime contract], and by all decisions, rulings, and interpretations of [DDC] or its authorized representative." Feingold Aff. Ex. J, Art. 9.

Under New York law, "while an agreement to arbitrate can be incorporated by reference, any such reference must clearly show such an intent to arbitrate." In the Matter of Aerotech World Trade. Ltd. v. Excalibur Systems, Inc., 236 A.D.2d 609, 611 (2d Dep't 1997). In General Railway Signal Corp. v. L.K. Comstock & Co., for instance,

defendant Comstock contracted with the MTA to renovate subway signals in New York City.  254 A.D.2d 759 (4th Dep't 1998).  The Prime Contract between Comstock and the MTA provided that all disputes arising under it would be submitted to the MTA's Contractual Disputes Review Board for resolution.  Comstock, in turn, signed a subcontract with plaintiff to complete a portion of the work.  The subcontract, however, contained no language regarding the procedure for resolving disputes between plaintiff and Comstock.  The Court held that, because "[n]owhere in the subcontract is there a 'clear, explicit and unequivocal' agreement to arbitrate . . . the terms of the subcontract do not meet the rigid standards necessary to establish an explicit commitment by plaintiff to submit its claims against Comstock to alternative dispute resolution, as provided in the prime contract . . ."  Id. at 760.

Here, unlike the subcontracts that other courts have found to "unambiguously" incorporate by reference ADR provisions set forth in a prime contract, see, e.g., BAE Automated Systems, Inc. v. Morse Diesel Intern, Inc., No. 01 CIV. 0217, 2001 WL 547133, at *4 (S.D.N.Y. May 22, 2001), the Hill/Beys contract does not, on its face, contain any "clear and express intent" to submit any disputes to ADR, nor does it mention the ADR provisions contained in the DDC/Hill contract.  Accordingly, under the rulings in Aerotech and Comstock, the Hills/Beys contract fails to establish a "clear and express intent" by Beys to submit disputes to ADR.[2]

---

[2] Beys and Federal argue that in the course of denying Federal's pre-discovery summary judgment motion, the Court held

Hill argues that the Hill/Beys contract implicitly demonstrates Beys' intent to be bound by ADR procedures, because Article 9 refers to Beys being "bound to the decisions, rulings, and interpretations of [DDC] or its authorized representative." Feingold Aff. Ex. J, Art. 9. The Court disagrees. On its face, this language makes no reference to the ADR provisions in the prime contract at all, and instead only addresses the significance of determinations made by DDC "or its authorized representative." Were this Court to find that such language gives rise to an implied agreement to arbitrate, it would essentially be enforcing an arbitration agreement that depends solely "upon implication or subtlety," a result that is not permitted under New York law. Thomas Crimmins Contr. Co., 74 N.Y.2d at 171. In short, the language relied on by Hill falls far short of the "rigid standards necessary to establish an explicit commitment" by Beys to submit all of its claims to ADR. Gen. Ry. Signal Corp., 254 A.D.2d at 760.

Moreover, as the Court previously observed, even assuming that the entirety of the prime contract (including all of its ADR provisions) were properly incorporated by reference into the Hill/Beys contract, the prime contract itself is ambiguous, at best, as to whether Beys is, in fact, bound by the ADR provisions. Specifically,

---

that Beys was not bound by the ADR provisions in the prime contract, and that this holding is the law of the case. Although the Court did not expressly make such a determination at the time (and indeed, at that time, Beys was not yet a party to this action), it does so now.

Article 29 of the DDC/Hill contract expressly pertains only to "disputes between the City and the Contractor," and the prime contract's definition of the term "Contractor" does not extend to subcontractors such as Beys.  July 16, 2008 Op. at 8-9.  Because this is not a dispute between the Contractor (Hill) and the City, and because any ambiguity must be interpreted against the drafter, Hill, see Bazin v. Walsam 240 Owner, LLC, 18 Misc. 3d 290, 294 (Sup. Ct. N.Y. Co. 2007), the Court is of the view Article 29 does require Beys to submit its dispute to ADR.

Finally, Hill invokes the doctrine of judicial estoppel, arguing that Beys cannot now deny that it is bound to submit all disputes through the ADR process, because it previously submitted affidavits in support of Federal's pre-discovery motion for summary judgment indicating that it "expressly contemplated that any claims . . . would be resolved exactly as they are resolved under the [prime contract]."  Feingold Aff. Ex. U ¶ 15.  In order for Hill to invoke judicial estoppel, however, "the inconsistent position" advanced by Beys "must have been adopted by the court in some matter."  Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006).  Here, when ruling on Federal's motion for summary judgment, the Court in no way relied upon Beys' previous statements concerning its subjective intent.  Indeed, such reliance would have been misplaced, because extrinsic evidence of a party's intent is entirely irrelevant to the question of whether or not that party is required to submit its disputes to ADR. See Mencher v. Weiss, 306 N.Y. 1, 7 (1953) ("the manifestation of a party's

intention rather than the actual or real intention is ordinarily controlling").

Accordingly, for all of these reasons, Hill's motion for summary judgment dismissing Beys' Fourth-Party Complaint based on the ADR provisions in the prime contract is hereby denied.

Federal and Beys next move for summary judgment as to IWC's pending change orders for work relating to stainless steel convector covers, the change in steel gauge for the stainless steel convector covers, and bird screens, on the ground that such work was within the scope of the original contract and thus cannot form the basis for additional recovery.  Likewise, Hill moves for summary judgment dismissing Beys' Fourth-Party Complaint as to the first two of these three change orders.

Under New York law, "except in case[s] of fraud, the owner cannot . . . be compelled to pay any greater sum for the completion of a building than by his contract he has agreed to pay."  Crane v. Genin, 60 N.Y. 127, 131 (1875); see La Rose v. Backer, 11 A.D.2d 314, 318 (3d Dep't 1960) (asking "[w]hat happened to the contract between the parties?" and dismissing lien claims in excess of original contract price for project agreed to by the owner, despite claims for "extras" and alleged change orders not executed pursuant to the terms of the owner's agreement).

Here, stainless steel convector covers are identified in Section 08930 of the prime contract and incorporated by reference in the "Scope of Work" section of the IWC subcontract, are identified in Drawing A-313 (which is among the drawings governing IWC's work), and

15

are not included among the subcontract's exclusions or qualifications.
Similarly, bird screens are identified in Drawing A-321 and
incorporated by reference into the "Scope of Work" section of the IWC
subcontract, and are likewise not included among the subcontract's
exclusions or qualifications.  Further, although IWC seeks recovery
for increased costs associated with a change in gauge for the
stainless steel convector covers, the covers themselves are, as noted,
within the scope of the IWC subcontract, and the subcontract holds IWC
"responsible for all construction means, methods, techniques and
procedures within the scope of [IWC's] Work."  Taken together, these
aspects of the IWC subcontract plainly demonstrate that work
associated with the stainless steel convector covers and bird screens
and the costs associated with the change in steel gauge were all
included within the scope of the subcontract, and thus cannot form the
basis for additional recovery.

     IWC argues that, notwithstanding the language of the IWC
subcontract, it was told by Paul Rivera (Beys' Project Manager) that
stainless steel convector covers and bird screens were <u>not</u> included
within the scope of the IWC subcontract, and were thus "extra."
Beninato Aff. ¶¶ 13, 18.  In other words, IWC contends that the
subcontract was orally modified to remove stainless steel convector
covers and bird screens from the subcontract's purview.  Under New
York law, however, where a contract requires any amendments to be
evidenced by a writing signed by the parties, oral modifications to
the contract are prohibited.  N.Y. Gen. Oblig. Law § 15-301(1); <u>SAA-A,
Inc. v. Morgan Stanley Dean Witter & Co.</u>, 281 A.D.2d 201, 203 (1st

Dep't 2001) (oral modifications not permitted where contract stated
that it "cannot be changed unless mutually agreed upon in writing by
both parties," and where "the alleged modification obligate[d]
plaintiff to do no more than it was already required to do under the
terms of the written agreement) (internal quotation marks omitted);
see Rose v. Spa Realty Assoc., 42 N.Y.2d 338, 343 (1977) ("if the only
proof of an alleged agreement to deviate from a written contract is
the oral exchanges between the parties, the writing controls").  Here,
as noted above, the subcontract requires all modifications to be made
in writing and signed by two individuals, thus rendering any oral
modification (including those here claimed by IWC) invalid.

　　　　Nor is there any indication that "the limited exceptions to
the requirement of a written modification," viz., partial performance,
estoppel, or a fully executed oral modification, are applicable here.
Tierney v. Capricorn Investors, L.P., 189 A.D.2d 629, 631 (1st Dep't
1993).  In order to avoid the requirement of a written and signed
modification, any alleged partial performance must be "unequivocally
referable" to the alleged modification, and in order to invoke the
doctrine of equitable estoppel, IWC must demonstrate that the conduct
relied upon is "not otherwise [] compatible with the agreement as
written."  Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 343-44 (1977).
Here, however, IWC's work relating to stainless steel convector covers
and bird screens is entirely consistent with its obligations under the
original subcontract, and any reliance on behalf of IWC amounted to
nothing more than what the subcontract already required IWC to do.
Similarly, to the extent that there was full performance of any

17

alleged modification, such performance does not in any way

"demonstrate, objectively, the nature and extent of the modification,"

id. at 343, because, as noted, such performance was already required

under the terms of the original subcontract.  Accordingly, in such

circumstances, IWC cannot avoid the requirement of a signed writing as

to these three change orders.

Furthermore, even assuming (contrary to fact), that the

alleged oral modifications were otherwise valid, there is no

indication that such modifications (i.e., the removal of certain

pieces of work from the purview of the subcontract) were supported by

adequate consideration.  See Tierney, 189 A.D.2d 629 ("Neither a

promise to do that which the promisor is already bound to do, nor the

performance of an existing legal obligation constitutes valid

consideration").

At oral argument, counsel for IWC argued that the parties'

course of conduct waived the foregoing requirements, because there

were other instances in which IWC was compensated for work that was

previously included within the scope of the IWC subcontract.

"[W]aiver should not be lightly presumed," however, Gilbert Frank

Corp. v. Fed. Ins. Co., 70 N.Y.2d 966, 970 (1988), and an intent to

waive a contractual right cannot be inferred from doubtful or

equivocal acts.  East 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129 (3d

Dept. 1983).  Here, IWC has failed to point to any evidence to support

its argument in this respect, and, indeed, such an argument is

directly contradicted by the deposition testimony of IWC's principals,

who acknowledged that stainless steel convector covers and bird screens were required under the terms of the IWC subcontract.[3]

It also bears noting that although IWC's president testified that IWC's original, pre-execution proposal excluded stainless steel convector covers and bird screens, such extrinsic evidence is inadmissible to alter the meaning of the fully integrated and unambiguous subcontract at issue here. See Meinrath v. Singer Co., 482 F. Supp. 457, 460 (S.D.N.Y. 1979) (Weinfeld, J.) ("One of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given."). This principle particularly holds true where, as here, there is a clear and unambiguous merger clause in the operative agreement. Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599 (1997).

Accordingly, for all of the foregoing reasons, Federal's, Beys', and Hill's motions for summary judgment dismissing the claims for IWC's pending change orders for work relating to stainless steel convector covers and bird screens are granted, as is Federal's and Beys' motion for summary judgment dismissing the claims as to the change in steel gauge.[4]

---

[3] By contrast, as discussed below, IWC has offered evidence, in the form of an affidavit, that Beys waived this requirement as to "extra" work (i.e., work not included within the scope of the subcontract).

[4] As noted above, Hill, unlike Federal and Beys, does not move for summary judgment as to the change in gauge for the stainless steel convector covers. Because the Court is granting

Next, Federal, Beys, and Hill all move for summary judgment dismissing the claims relating to IWC's curtain wall change order, arguing that work relating to that change order falls within the scope of the IWC subcontract.  The Court agrees.

As noted, the IWC subcontract holds IWC responsible "for all construction means, methods, techniques and procedures within the scope" of its work, and requires IWC to perform all work in conformity with contract documents, to comply with all federal, state, and OSHA requirements, and to obtain all necessary permits or approvals from federal, state, or local agencies.  Similarly, the DDC/Hill contract, which was included among the documents comprising the IWC subcontract, requires IWC to notify the MTA before starting construction due to the proximity of the site to the 135th Street IRT subway station, to obtain all approvals from the MTA, and to submit a "means and method" for the curtain wall installation.  Thus, taken as a whole, the governing contracts at issue here demonstrate that IWC was responsible for all means and methods necessary to perform its work (i.e. the installation of the curtain wall) and for obtaining all necessary approvals for that work.

IWC contends that it was unaware of the existence of the subway station and of the need to obtain MTA approval for the delivery and installation of the curtain wall.  See Cook Aff. Ex. B at 33-35.  Putting aside the credibility of such assertions, it is well-

---

Federal's and Beys' motion in this respect, however, any claim asserted against Hill as to the change in gauge is rendered moot, and Beys' Fourth-Party Complaint against Hill is thus dismissed in this respect as well.

established under New York law that a party is charged with knowledge
of the contents of its contracts regardless of whether it chose to
read the contents.  Sorenson v. Bridge Capital Corp., 52 A.D. 3d 265,
266 (1st Dep't 2008); see Gillman v. Chase Manhattan Bank, N.A., 73
N.Y.2d 1, 11 (1988) (noting that a party "would be conclusively bound"
by an agreement "irrespective of . . . testimony that he did not read
it and was unaware of its terms").  Although IWC's vice-president
submitted an affidavit averring that he "requested that Beys provide
[him] with a copy of the prime contract between Hill and DDC and the
general, supplementary and special conditions," but that "Beys failed
to do so," Beninato Aff. ¶ 10, there is no allegation of fraud,
duress, or any other wrongful act here, and the undisputed facts show
that IWC executed the subcontract that incorporated and included the
DDC/Hill contract.  Indeed, IWC concedes that it understood that the
DDC/Hill contract formed part of the IWC subcontract, and was thus
binding on IWC.  Fed. 56.1 ¶ 23; IWC 56.1 ¶ 23.

At oral argument, counsel for IWC argued that Article 21 of
the DDC/Hill contract, which permits modification of the contract in
the face of "changed conditions," entitles IWC to compensation for its
work relating to the delivery of the curtain wall.  The circumstances
surrounding the delivery of the curtain wall, however, were hardly
"unforeseeable" or "not reasonably anticipated," and IWC could hardly
have been surprised to learn that the placement of an 18 wheeler
truck, heavy machinery, and curtain wall materials directly above a
subway station posed a risk of exceeding the load bearing capacity of
the subway structure.  IWC had every opportunity to inspect the site

and to discover the existence of the subway station before entering into the subcontract, but failed to do so.  In such circumstances, IWC cannot now complain that because "the actualities of performance did not match its expectations," it should somehow be relieved of its obligation "to do the work it agreed to do."  Depot Constr. Corp. v. State, 19 N.Y.2d 109, 113 (1967).  Further, even assuming that the alleged "extra work" relating to the curtain wall change order is attributable to changed conditions, Article 21 requires a contract modification subject to the Commissioner's written approval, and there was none here, thus precluding recovery on that separate, independent basis.  See Naclerio Contracting Co. v. Envtl. Prot. Admin., 113 A.D.2d 707, 710 (1st Dep't 1985).[5]

        For all of these reasons, the Court hereby grants Federal's, Beys', and Hill's motion for summary judgment dismissing the claims relating to IWC's curtain wall change order.

        Hill also moves for summary judgment as to all of IWC's pending change orders for extra work, on the ground that IWC failed to comply with the change order procedures set forth in the IWC

_____

        [5] IWC also argues, without citing any caselaw, that it is entitled to payment for the curtain wall change order because there is no owner's determination clause in the IWC subcontract. The Prime Contract, however, (which is deemed part of the IWC subcontract) makes clear that only DDC has the authority to sign and approve any change orders submitted by IWC.  Hamilakis Aff. Ex. A Art. 26.  In any event, the work covered by that change order is, as noted, expressly within the scope of the original subcontract, thus precluding IWC from receiving extra compensation for such work.

subcontract and the DDC/Hill agreement.[6]  Under New York law, contractual provisions that forbid a contractor from executing any extra work or making any modifications or alterations in the work without first obtaining a written change order are valid and enforceable.  Gen. Obl. § 15-301(1); see Langley v. Rouss, 185 N.Y. 201, 207 (1906); F. Garofalo Elec. Co. v. New York Univ., 270 A.D.2d 76 80 (1st Dep't 2000) ("The contract's notice and documentation requirements for extra work and delay damages are conditions precedent to plaintiff's recovery and the failure to strictly comply is deemed a waiver of such claims").  "[T]he prohibition of oral waiver may itself be waived," however, Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 387 (1919) (Cardozo, J.), and New York courts routinely hold that "the general course of conduct between the parties[] may modify or eliminate contract provisions requiring written authorization or notice of claims."  Barsotti's, Inc. v. Consolidated Edison Co., 254 A.D.2d 211, 212 (1st Dep't 1998).

Here, as noted, the IWC subcontract and the DDC/Hill Agreement each set forth clearly defined procedures for the approval of extra work or change orders.  See Hamilakis Aff. Ex. C Art. 8; id. Ex. A Art. 26.1.  Although IWC has failed to offer any evidence that it ever complied with the governing change order procedures, it nevertheless

_____

[6] As discussed above, the work relating to stainless steel convector covers, change in steel gauge for stainless steel convector covers, bird screens, and delivery of the curtain wall is all included within the scope of the IWC subcontract, and thus does not amount to "extra work."  Accordingly, the Court limits its analysis in this respect to the remaining change orders that allegedly relate to work not originally included in the IWC subcontract.

has submitted an affidavit from IWC's president averring that, putting aside the pending change orders that are the subject of the instant action, "there were five other change orders for extra work performed by IWC which were approved and paid by Beys," and that IWC "proceeded with extra work on verbal direction from Paul Rivera, Beys' project manager, [w]ithout the need for fully executed change orders." Vicario Aff. ¶¶ 33-34.  Hill has failed to come forward with any evidence to dispute IWC's proffered evidence of waiver.  Accordingly, because genuine issues of material fact remain as to whether Beys waived the contractual prohibition of oral waiver for extra work, Hill's motion for summary judgment in this respect must be denied.

Finally, Federal and Beys move for summary judgment on the ground that IWC failed to provide contemporaneous work records of its alleged "extra work" as required by Article 30 of the DDC/Hill contract, and Hill similarly moves for summary judgment dismissing Beys' Fourth Party Complaint on the ground that IWC failed to provide "sufficient proof" to support its change orders.[7]  It is well-established that a failure to comply with provisions requiring written documentation of "extra work" can preclude a contractor from recovering for such work, see, e.g., A.I. Smith Electrical Contractors, Inc. v. New York, 181 A.D.2d 542 (1st Dep't 1992), and IWC concedes that it failed to provide work records to support its change orders for extra work.  Fed. 56.1 ¶ 40; IWC 56.1 ¶ 40.  As with

_____

[7] As with the previous motion, the Court limits its analysis in this respect to the change orders for work that allegedly was not included within the original IWC subcontract.

its failure to comply with the change order provisions, however, IWC argues, based on a sworn affidavit, that Beys waived any requirement to submit such records, because Beys approved and paid for other, unrelated change orders for extra work notwithstanding IWC's failure to submit contemporaneous records of that work.  Vicario Aff. ¶¶ 33-34.  Federal, Beys, and Hill all have failed to come forward with any evidence to refute IWC's proffered evidence of waiver.  Accordingly, summary judgment in this respect likewise must be denied.

For all of the foregoing reasons, the Court hereby dismisses all claims asserted by all parties in this action arising out of IWC's pending change orders for (1) stainless steel convector covers; (2) change in steel gauge for stainless steel convector covers; (3) bird screens; (4) concealed steel beams; and (5) the delivery of the curtain wall.  Summary judgment is denied in all other respects. Counsel for all parties are instructed to jointly call Chambers by no later than April 13, 2009 to schedule a trial of the remaining claims. The Clerk of the Court is directed to close document numbers 36 and 41 on the Court's docket.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        April 7, 2009

25